IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

United States District Court
Southern District of Texas
FILED

**NOV 0 2 2000**

Michael N. Milby, Clerk

DIANA L. REECE,
    Plaintiff,

§
§
§
§
§
§
§

V.

§

CIVIL ACTION NO. C-00-112

§

COLUMBIA/HCA HEALTHCARE
CORPORATION, COLUMBIA BAYVIEW
PSYCHIATRIC CENTER, AND BAY AREA
HEALTHCARE GROUP, LTD. d/b/a
CORPUS CHRISTI MEDICAL CENTER,
    Defendants.

§
§
§
§
§
§

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
## WITH SUPPORTING ARGUMENTS, AUTHORITIES AND AFFIDAVIT

### TO THE HONORABLE UNITED STATES DISTRICT COURT:

NOW COME **Columbia/HCA Healthcare Corporation, Columbia Bayview Psychiatric Center, and Bay Area Healthcare Group, Ltd. d/b/a Corpus Christi Medical Center**, "Defendants" in the above-entitled and numbered cause, and file this Motion for Summary Judgment against "Plaintiff" **Diana Reece**'s entire claim against Defendants, and in support thereof would respectfully show the Court the following:

### I.

### SUMMARY OF ARGUMENT

1.    Defendants rejected coverage under the Texas Workers' Compensation Act. However, when they rejected coverage, they established the voluntary Employee Health and Safety Benefit Program of Columbia/HCA Healthcare Corporation (the "Plan") under the Employee Retirement Income and Security Act of 1974 ("ERISA") to provide employees electing to participate in the Plan with certain benefits for occupational injuries and illnesses. Employees elect to participate in the Plan by signing the election containing a waiver and release agreement. As a condition of enrollment and the right to receive "no-fault" benefits

Motion for Summary Judgment- Page 1

19.

under the Plan, employees agree to waive all prior and future claims and causes of action arising out of injury or death sustained in the course and scope of employment, and further acknowledge that their only remedy will be to seek benefits under the Plan.

2.    Plaintiff elected to participate in the Plan by signing the waiver and release election agreement on December 11, 1997.  After executing her election signifying her intent to join the Plan and waiving her claims for personal injury against her employer, she sought and received benefits under the Plan from Defendant following alleged on-the-job incidents on February 7, 1998, September 29, 1998 and January 16, 1999.   Thereafter, Plaintiff did exactly what she agreed not to do.  Plaintiff sued Defendants on February 7, 2000.  Moreover, Plaintiff has never returned or tendered back any of the benefits she received under the Plan.

3.    In connection with her common-law negligence suit of February 7, 2000, Plaintiff has also alleged that Defendants wrongfully denied/terminated her benefits under the ERISA-qualified employee benefit plan.  However, benefits were only terminated pursuant to the terms of the Plan after Plaintiff voluntarily submitted her resignation so that she could go to work at another facility.

4.    This Motion for Summary Judgment is based upon Defendants' affirmative defenses of release and waiver, Plaintiff's subsequent ratification of the release by retaining Plan benefits, and/or estoppel.  Likewise it is based on the complete absence of any evidence that Defendants acted arbitrarily or capriciously in denying Plaintiff's ERISA benefits; rather, benefits were terminated on the basis of Plaintiff's requested resignation.

5.    The undisputed facts and law require dismissal of Plaintiff Diana Reece's claims as a matter of law.

## II.

## UNDISPUTED FACTS AND SUMMARY JUDGMENT EVIDENCE

6.       The following undisputed facts are supported by the pleadings and the attached affidavit:

A.       Plaintiff Diana Reece brought this action on February 7, 2000, claiming that she was injured on or about February 7, 1998, September 29, 1998 and January 16, 1999, alleging negligence.  (See Exhibit "A", Plaintiff's Original Petition.)

B.       Plaintiff alleges that she was injured in the course and scope of her employment with "Defendants".  (See *id.*)  In fact, however, only Columbia Bayview Psychiatric Center ("Bayview") employed Plaintiff.  (See Affidavit of Debbie Vogelsang attached hereto and incorporated herein by reference for all purposes as Exhibit "B", para. 4.)

C.       Prior to the incident that is the subject of this suit, Plaintiff's employer rejected coverage under the Texas Workers' Compensation Act and, remained a non-subscriber to the Act at all relevant times to Plaintiff's causes of action.  (See *id.*, para. 5.)

D.       In lieu of worker's compensation coverage, Plaintiff's employer implemented the Columbia/HCA Healthcare Corporation Employee Health and Safety Program Benefit Plan (the "Plan") to provide the facility's employees who elect to participate in the Plan with certain benefits for occupational injuries and illnesses. (See *id.*, para. 7; Exhibit "B-1 thereto, Columbia/HCA Healthcare Corporation Employee Health and Safety Program Benefit Plan; and Exhibit "B-3 thereto, Columbia/HCA Healthcare Corporation Employee Health and Safety Program Summary Plan Description.)

E.    The Plan was maintained in accordance with the requirements of the Employees Retirement Income Security Act ("ERISA").  (See *id.*, para. 10.)

F.    According to its terms, the Plan provides certain benefits to on-the-job injured employees regardless of fault.  (See *id.*, para. 11.)

G.    Participation in the Plan by the employees is voluntary and does not affect their employment.  (See *id.*, para. 12.)

H.    Employees who elect to participate in the Plan do so by submitting and executing an Election to Participate in the Employee Health and Safety Program of Columbia/HCA Healthcare Corporation (the "Election Agreement").  (See *id.*, para. 13; and, Exhibit "B-2".)

I.    As a condition of enrollment and the right to receive benefits under the Plan, participating employees agreed to waive all rights, claims and causes of action for work-related injuries; and further agreed that benefits under the Plan will be their exclusive source of recovery.  (See *id.*, para. 14.)

J.    The Election Agreement is an integral part of the Plan.  (See *id.*, para. 15.)

K.    On December 11, 1997, Plaintiff executed the Election to Participate in the Employee Health and Safety Program Benefit Plan of Columbia/HCA Healthcare Corporation (the "Election Agreement").  (See *id.*, para. 16, the Election Agreement attached as Exhibit "B-2".)  Plaintiff acknowledged that if she elected to participate in the Plan, she would receive benefits and such election was voluntary.  (See Exhibit B-2, Election Agreement.)

L.    Plaintiff was given the opportunity to participate in the Plan; thereafter, Plaintiff voluntarily elected to participate in this Plan after being given the opportunity to read and ask questions about the document containing the Election Agreement prior

to acceptance of Plan benefits. (See executed Election Agreement attached hereto as Exhibit "B-2").

M.    Plaintiff claimed she sustained on-the-job injuries on or about February 7, 1998, September 29, 1998 and January 16, 1999. (See Plaintiff's Original Petition.)

N.    As a result of Plaintiff's claimed on-the-job injury, Plaintiff was entitled to make a claim for medical benefits and wage continuation benefits under the Plan. In fact, she did make such a claim, and was provided medical care and lost wage benefits pursuant to the Plan. As of February 7, 2000, Plaintiff had received over $3,792.50 in Plan benefits. (See Affidavit of Debbie Vogelsang, para.19.)

O.    Now Plaintiff has done exactly what she agreed not to do. She has sued her employer at common-law. As this Motion shows, Plaintiff's prior waiver precludes this suit. (See Exhibit "B-2".)

P.    Moreover, Plaintiff has not returned any of the benefits she received under the Plan. (See Exhibit "B", para. 20.)

Q.    Finally, Plaintiff has admitted that she has no legal claim that Defendants wrongfully denied her ERISA benefits as the termination of benefits was based on Plaintiff's voluntary resignation (see Exhibit "C", Transcript of Hearing on May 17, 2000, pg. 5, ln. 5 to pg. 6, ln. 9; pg. 7, ln. 10 to pg. 8, ln. 11.)

## III.

## ARGUMENTS AND AUTHORITIES

### A.   Standard of Review

7.    Summary judgment is appropriate if the moving party establishes that there is no genuine issue as to any material fact and that it is entitled to a judgment as a matter of law. FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 320 (1986). The undisputed facts established with summary judgment evidence, authorities and arguments

show that Defendants are entitled to judgment because all of the elements of Defendants' affirmative defenses of waiver, release, ratification and/or estoppel are conclusively proven as to Plaintiff's negligence claim and because a rational basis exists for the termination of Plaintiff's benefits.

**B.      Plaintiff Waived her Right to Bring Suit by Electing to Participate in the Plan**

　　　　**1.      Summary judgment evidence satisfies each element of waiver defense**

8.      Under Texas law, Defendant's waiver defense contains three elements: (1) the existence of a right held by the waiving party; (2) knowledge, actual or constructive, by that party of its existence; and (3) an actual intent by that party to relinquish the right, which can be inferred from conduct. *Vessels v. Anschutz Corp.*, 823 S.W.2d 762, 765 (Tex. App.–Texarkana 1992, writ den'd); *Federal Deposit Ins. Corp. v. Attayi*, 745 S.W.2d 939, 946 (Tex. App.–Houston [1st Dist.] 1998, no writ).   Defendant has established each of these elements through competent summary judgment evidence. Plaintiff had the right to bring common law causes of action against Defendant because of its status as a non-subscriber.  Plaintiff received notice of this right in the Waiver.  *See* Exhibit "A-1."  Plaintiff signed the Waiver, thereby demonstrating her intent to waive that right.  *See id.*

9.      The waiver signed by Plaintiff clearly applies to this case.  On December 11, 1997, Plaintiff executed the Election to Participate in the Employee Health and Safety Program Benefit Plan of Columbia/HCA Healthcare Corporation (the "Election Agreement" or "Waiver") thereby electing to enroll in Defendants' Plan and waiving her rights to sue Defendants for work-related injuries.  This waiver, upon which Defendants' answer was founded, was fully proven in evidence, both as a business record and an operative document signed by Plaintiff. (See Exhibit "B," Affidavit of Debbie Vogelsang.)

The scope of the waiver, which expressly includes negligence claims, undoubtedly includes this lawsuit. That is, there can be no doubt that the signed agreement between the parties expresses an intent that Ms. Reece waived her right to bring this lawsuit.

10.     Waivers such as the one signed by Ms. Reece have long been upheld as valid in Texas. The leading case since 1995 has been *Brito v. Intex Aviation Services, Inc.*, 879 F. Supp. 650 (N. D. Tex. 1995), which explicitly upheld a waiver almost exactly like the one in this case.[1] There, as here, the plaintiff had executed a pre-injury waiver as part of an election to become a participant in an employee benefit plan of her non-subscriber employer. The Court granted summary judgment. *Id.* at 650. This case stood as the only authority directly on point for several years, and was relied upon in scores of summary judgments in the state, but not leading to appellate decisions.[2]

11.     Now, within a year, there are four new opinions on point, three of which clearly support summary judgment here. In the three best-reasoned cases, *Lambert v. Affiliated Foods, Inc.*, 20 S.W.3d 1 (Tex. App.–Amarillo 2000, pet. granted); *Lawrence v. CBC Services, Inc.*, 16 S.W.3d 35 (Tex. App.–Amarillo 1999, pet. granted), and *Wolfe v. C.S.P.H., Inc. d/b/a Domino's Pizza*, 24 S.W.3d 641, 645 (Tex. App.–Dallas, 2000, no pet. h.), the courts have held that traditional principles of contract law control these waivers.

---

[1]  *Brito* followed the correct observation in 1994 by Judge Edith Jones in dissent in *Hook v. Morrison Milling Co.*, 38 F.3d 776 (5th Cir. 1994), that such waivers were valid in Texas. *See id.* at 787 n. 2.

[2]  Two notable unpublished opinions that were frequently referred to because their reasoning was so solid and well written were the Fifth Circuit opinion in *Duran v. Intex Aviation Services, Inc.*, No. 3:95-CV-0403-R N. D. Tex. Nov. 9, 1995), aff'd No. 95-11180 (5th Cir. 1996) (per curiam, Judges King, Wiener and Benavides) (unpublished affirming summary judgment against negligence claim of plaintiff who signed waiver upon enrollment in ERISA benefit plan ,and Judge Buchmeyer's opinion in *Bustos v. Intex Aviation Services, Inc.*, 3:95-CV-1264-R (n. D. Tex. 1996) (Buchmeyer, C.J.) (granting summary judgment against negligence claim of plaintiff who signed waiver upon enrollment in ERISA (benefit plan). Copies of these unpublished opinions are attached hereto for the Court's convenience.

12.     These opinions not only follow and harmonize with *Brito*, but with a vast number of cases that hold that arguments between employees and employers are controlled by contract law in general. *See, e.g., Collier v. Allstate Insurance Co.*, 395 F.2d 719, 720 (5th Cir. 1968) (holding that voluntary workers' compensation plan containing waiver provision prohibited plaintiff from pursuing both federal court action for benefits under the plan and state court action for common law damages); *Losano v. Ingram Mfg. Co.*, 132 L.R.R.M. 2741 (BNA) (W. D. Tex. 1989) (upholding validity of provision in collective bargaining agreement under which employer agreed to provide certain benefits in lieu of workers' compensation, and the parties agreed to define and limit remedy available to employees for on-the-job injuries); *Cisneros v. Insurance Co. of N. Am.*, 254 F. Supp. 864, 866 (S. D. Tex. 1996) (voluntary compensation policy of employer that measures benefits by what workers' compensation would have paid purely on a contractual matter); *Tigrett v. Heritage Bldg. Co.*, 533 S.W.2d 65 (Tex. Civ. App.–Texarkana 1976, writ ref'd n.r.e.) (upholding implied-in-fact contract under which employee waived rights to additional recovery by agreeing to accept benefits measured by provisions of workers' compensation laws); *Crain v. Tompson*, 510 S.W.2d 412, 413 (Tex. Civ. App.–Dallas 1974, no writ); *Lopes v. Texas Employers Ins. Ass'n*, 441 S.W.2d 318, 319 (Tex. Civ. App.–San Antonio 1969, no writ) (rights of nonsubscribers measured purely by contract). This is consistent with Texas law which holds that "[v]oluntary workmens' compensation is purely a matter of contract and the rights and obligations of the parties are measured by the contract." *United States Fidelity & Guaranty Co. v. Valdez*, 390 S.W.2d 485, 489 (Tex. Civ. App.–Houston 1965, writ ref'd n.r.e.); *Employers Mut. Casualty Co. v. Poorman*, 428 S.W.2d 698, 700 (Tex. Civ. App.–San Antonio 1968, writ ref'd n.r.e.). Because traditional contract principles apply, this summary judgment must be granted.

13.     In the recent trilogy of case law on this issue, both the Amarillo and Dallas Court of Appeals upheld the validity and enforceability of an employee's waiver tied to an election to participate in a voluntary employee benefit plan as enforceable under Texas law.   More specifically, in *Lawrence v. CBC Services, Inc.*, 16 S.W.3d 35 (Tex. App.–Amarillo 1999, pet. granted), the Amarillo Court of Appeals directly addressed whether an employee's waiver tied to an election to participate in a voluntary employee benefit plan was enforceable under Texas law.   *See Lawrence*, 16 S.W.3d at 38. Ultimately upholding the validity of the waiver, the court in *Lawrence* addressed the prevailing law in Texas on this issue and concluded that agreements in which one party releases another party from responsibility for future acts of negligence has long been a part of otherwise valid Texas law. *Id.* at 41.

14.     The Amarillo Court of Appeals again addressed this issue and properly held in favor of the waiver's enforceability under Texas law in *Lambert v. Affiliated Foods, Inc.*, 20 S.W.3d 1 (Tex. App.–Amarillo 1999, pet. granted).   In *Lambert*, as was the case in *Lawrence*, and this case, an employee executed an election agreement containing a waiver of common-law rights. *Lambert*, 20 S.W.3d at 2-3.   The employee voluntarily agreed to be a participant in her employer's benefit plan and receive no-fault benefits in exchange for her waiver of her right to sue her employer for on-the-job injuries. *Id.* Likewise, the election form clearly and expressly delineated that the employee would be waiving her common-law right to sue her employer for on-the-job injuries. *Id.* at 3. Thereafter, the employee filed suit for personal injury damages. *Id.*   The employer responded by answering and filing a Motion for Summary Judgment based in part on the plaintiff's prior waiver, the same basis as Defendant's Motion for Summary Judgment in this case. *Id.*   The employee responded to the Motion for Summary Judgment by citing

the recent San Antonio Court of Appeals opinion, *Reyes v. Storage & Processors, Inc.*, 995 S.W.2d 722 (Tex. App.–San Antonio 1999, writ denied).  Relying on *Reyes*, the plaintiff argued, that because the benefits under the plan in question were not equivalent to the Texas Worker's Compensation Act, the waiver was void as against public policy. *Id*.

15.    In approaching this argument, the *Lambert* court reiterated its decision in *Lawrence*, 20 S.W.3d at 5.  The court expressly addressed the *Reyes* opinion, maintaining:

> Although we are often in agreement with our colleagues, in this instance, we prefer to exercise judicial constraint and not invade the province of the legislature.

*Id*.

16.    The *Lambert* court noted Texas courts have historically recognized various common law grounds to invalidating private contracts; however, instead of seeking to avoid the effect of the waiver agreement on judicial grounds, the employee, as in this case, contended that the waiver was unenforceable on public policy grounds as discussed in *Reyes*.  *Id*.

17.    Recognizing its constitutional limitations, the *Lambert* court opined that an appellate court "should not invade the legislative field and that it is not for the judiciary to dictate to the legislature how to discharge its duty."  *Id*.  (quoting *Edgewood Independent Sch. Dist. v. Meno*, 917 S.W.2d 717, 726 (Tex. 1995).

18.    The *Lambert* court properly determined that it was not the court's place to "make a new contract between the parties regardless of whether one or more of the parties contracted wisely or foolishly or created a hardship for himself."  *Lambert*, 20 S.W.3d at 5.  Relying on *Meno*, the *Lambert* court maintained that it is not the responsibility of the

courts to judge the wisdom of the policy choices of the Legislature or to impose a different policy. *Id*.

19.     The *Lambert* court concluded that holding an employee's waiver void on public policy grounds would constitute a "judicial creation of subsection (4) to section 406.033(a)...." *Id*. Criticizing the *Reyes* court for legislating public policy, the *Lambert* court held because "the Act does not provide that such waivers of rights to sue for personal injuries shall not be available as a defense in section 406.033(a) or elsewhere, and taking the Act 'as we find it,' we decline to hold the waiver void on public policy grounds." *Id*.

20.     The well-reasoned decisions of *Lawrence* and *Lambert* were followed by the Dallas Court of Appeals on August 8, 2000. Addressing identical issues and similar facts, the Dallas Court of Appeals in *Wolfe v. C.S.P.H., Inc. d/b/a Domino's Pizza*, No. 05-98-00214-CV, 2000 WL 1100873 (Tex. App.–Dallas August 8, 2000, no pet. h.), held that the Texas Legislature has not established a public policy that conflicts with the employee's pre-injury waiver in exchange for on-the-job benefits. *See Wolfe*, 2000 WL 110873 at *4. The *Wolfe* court opined:

> We agree with the *Lawrence* court that pre-injury participation in a voluntary workers' compensation plan in exchange for a waiver of the right to sue is not contrary to public policy. As a nonsubscriber, CSPH's voluntary workers' compensation was purely a matter of contract and rights and obligations of the parties were measured by the contract.... As stated in *Lawrence*, the legislature has not established a public policy that conflicts with *Wolfe*'s pre-injury waiver in exchange for enhanced benefits.

*Id*. (internal citation omitted).

21.     As such, the *Wolfe* court declined to judicially create public policy on a subject the Legislature has clearly addressed. *Id*. The Dallas Court of Appeals ultimately upheld the trial court's granting of defendant's motion for summary judgment because: 1)

the waiver was not against any legislative created public policy; and, 2) the parties entered into a contract regarding the rights and obligations of the parties voluntarily. *Id.*

22.     Applying the well-reasoned rationale of the *Lawrence*, *Lambert* and *Wolfe* decisions to this case, it becomes apparent that the waiver agreement signed by Plaintiff signifying her election to participate in a no-fault occupational injury benefit plan in exchange for the waiver of her common-law right to sue is valid and enforceable.

**2.      Plaintiff Ratified the Release by Retaining the Benefits of the Plan**

23.     Likewise, Defendants are entitled to summary judgment based on Plaintiff's ratification of her waiver. Plaintiff is now barred from bringing this action because she has ratified the waiver by failing to return the consideration paid to her in connection with her execution of the release. Plaintiff has been provided $3,792.50 in benefits under the Plan. Plaintiff has not tendered any of these benefits back to Defendant before filing this suit. See, Exhibit "B" and Exhibit "C". Ratification occurs when a person who knows all the material facts confirms or adopts a prior act that they had a right to repudiate. *See, T&R Assoc., Inc. v. City of Amarillo*, 688 S.W.2d 622, 630 (Tex. App.--Amarillo 1985, writ ref'd n.r.e.); *Wise v. Pena*, 552 S.W.2d 196, 199 (Tex. Civ. App.--Corpus Christi 1977, writ dism'd). Ratification may be inferred from conduct and need not be express. *Petroleum Anchor Equip. v. Tyra*, 419 S.W.2d 829, 834 (Tex. 1967); *Spellman v. American Universal Invest.*, 687 S.W.2d 27, 29 (Tex. App.--Corpus Christi 1984, writ ref'd n.r.e.). Ratification arises when a party retains benefits of a transaction after acquiring full knowledge of it. *Solvex Sales Corp. v. Triton Mfg. Co.*, 888 S.W.2d 845, 849 (Tex. App.--Houston [1st Dist.] 1994, no writ).

24.     Failure to tender back the consideration of a promise not to sue, manifests an intention to be bound by the terms of the release. *Blakeney v. Lomas Info. Systems*, 65 F.3d 482, 484 (5th Cir. 1995). The requirement of the return of consideration is derived from

simple contract principles. Even if for some reason the waiver and release agreement is invalid, it is voidable, not void. If a releasor retains the consideration after learning that the release is voidable, her continued retention of the benefits constitutes ratification of the release. *Blakeney*, 65 F.3d at 484; *Walmsley v. Champlin Refining and Chem., Inc.*, 11 F.3d 534, 538-40 (5th Cir. 1993). Equity demands that "[a] party cannot be permitted to retain the benefits received under a contract and at the same time escape the obligations imposed by the contract." *Grillet v. Sears, Roebuck & Co.*, 927 F.2d 217, 220 (5th Cir. 1991). Accordingly, as Plaintiff did not tender back the acquired benefits under the Plan, she has, as a matter of law, ratified her waiver and release of Defendant thereby requiring this Court to enter judgment in favor of Defendants.

3.    **Plaintiff Estopped from Proceeding Forward With Suit**

25.    At the very minimum, Plaintiff should now be estopped from taking a position contrary to the representations and actions she exhibited in electing to participate in the Plan (thereby waiving her right to sue) and receiving benefits under the Plan. Defendant relied to its detriment on these actions in paying Plaintiff benefits. (see, Exhibit "B," para. 21). *See, Missouri Pacific R. Co. v. Harbison-Fischer Mfg. Co.*, 26 F.3d 531 (5th Cir. 1994), *as amended on denial of rehearing*; *Neiman-Marcus Group, Inc. v. Dworkin*, 919 F.2d 368 (5th Cir. 1990); *Enochs v. Brown*, 872 S.W.2d 312 (Tex. App.-Austin 1994) (quasi-estoppel precludes party for asserting to another's disadvantage a right inconsistent with a position he has previously taken).

C.    **Plaintiff concedes that Defendants had valid basis for termination of Plan benefits**

26.    Plaintiff contends that she is "morally" entitled to receive additional ERISA plan benefits; nevertheless, she admits that termination of her benefits was legitimately based on her voluntary resignation. (See Exhibit "C" pg. 7, ln. 22 to pg. 8, ln. 24.) As such, Defendants

are entitled to judgment as a matter of law as there can be no showing that Defendants arbitrarily or capriciously denied Plaintiff's benefits when termination of benefits was based on Plaintiff's own actions. (See Exhibit "B-4", denial letter of February 1, 1999.)

## VI.

## CONCLUSION

27.     Defendants Columbia/HCA Healthcare Corporation, Columbia Bayview Psychiatric Center, and Bay Area Healthcare Group, Ltd. d/b/a Corpus Christi Medical Center have proven, as a matter of law, that the waiver and release agreement entered into between Plaintiff and her employer is valid, enforceable and precludes Plaintiff's negligence claim against Defendants. Additionally and alternatively, Plaintiff has ratified the release by accepting and retaining benefits under the Plan or should be estopped from taking a position inconsistent with her previous actions.

28.     Moreover, Plaintiff admitted that she has no legal basis for pursuing a claim for wrongful termination of ERISA benefits when the termination was based on her voluntary resignation.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Defendants **Columbia/HCA Healthcare Corporation, Columbia Bayview Psychiatric Center, and Bay Area Healthcare Group, Ltd. d/b/a Corpus Christi Medical Center** respectfully request that the Court render judgment that Plaintiff **Diana Reece** take nothing as against Defendants Columbia/HCA Healthcare Corporation, Columbia Bayview Psychiatric Center, and Bay Area Healthcare Group, Ltd. d/b/a Corpus Christi Medical Center, and that Defendants be awarded such other and further relief, both in law and equity, to which they may show themselves justly entitled.

Respectfully submitted,

Kerry L. McGill - State Bar No. 13628700
ATTORNEY FOR DEFENDANTS

Of Counsel:
MARTIN & ASSOCIATES, P.C.
707 West 10th Street
Austin, Texas 78701
(512) 476-1696
(512) 469-7924 - Facsimile

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing document has been served in accordance with the Federal Rules of Civil Procedure on this 2nd day of November, 2000, to:

Diana L. Reece
PLAINTIFF PRO SE
1007 W. Yoakum
Kingsville, TX 78363

Kerry L. McGill

Motion for Summary Judgment- Page 15

STATE OF TEXAS          COUNTY COURT NO. _____/_____          COUNTY OF NUECES

DIANA L. REECE                          §
                                        §
                    PLAINTIFF,          §
                                        §
                                        §          NO. *00 - 60205 - 1*
VS.                                     §
                                        §
COLUMBIA/HCA HEALTHCARE                 §
CORPORATION, COLUMBIA BAYVIEW           §
PSYCHIATRIC CENTER, AND THE BAY         §
AREA HEALTHCARE GROUP, LTD., d/b/a      §
CORPUS CHRISTI MEDICAL CENTER           §
                                        §
                    DEFENDANTS.         §

## PLAINTIFF'S ORIGINAL PETITION

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COMES DIANA L. REECE, hereinafter called Plaintiff, complaining of Columbia/HCA Healthcare Corporation, Columbia Bayview Psychiatric Center, and the Bay Area Healthcare Group, Ltd., d/b/a Corpus Christi Medical Center, hereinafter called Defendants, and for cause of action would respectfully show unto the Court as follows:

## I.

## VENUE

Venue is in Nueces County for the reason Plaintiff's employment with Defendant was in Nueces County, Texas; Plaintiff's injuries of February 7, 1998, September 29, 1998, January 16, 1999, occurred in Nueces County, Texas; and Defendants have an office, agent, and representative, in Nueces County, Texas, and had such at the time of Plaintiff's injuries on February 7, 1998, September 29, 1998, and January 16, 1999.

Plaintiff has her residence in Kleberg County, Texas.

-1-



EXHIBIT
A

FILED JOANN ???
CLERK-DISTRICT COURTS
NUECES COUNTY, TEXAS
BY_____
2000 FEB -1 P 2:10
DPTY

Defendants, Columbia/HCA Healthcare Corporation is incorporated under the laws of Delaware, with its home office at One Park Plaza, Nashville, TN 37202-0555. Defendant has no agent for process of service in Texas, and is amendable to process in this State and subject to the jurisdiction of this Court through the Texas Long Arm Statute, Tex.Civ.Prac. & Rem. Code §17.044(a)(1) and §17.045; Defendant does not maintain a regular place of business in the State of Texas; does not maintain a resident agent for service of process in the State of Texas, and has not designated an authorized agent upon whom service of citation may be made. Therefore, service of citation is made pursuant to the Texas Long Arm Statute and the Secretary of State may give notice to Columbia/HCA Healthcare Corporation at its' home office at One Park Plaza, Nashville, TN 37202-0555.

The agent for service for Defendant, Columbia Bayview Psychiatric Center, a business entity, is the parent corporation, Columbia/HCA Healthcare, with its home office at One Park Plaza, Nashville, TN 37202-0555, where it may be served with citation on the President of the Corporation.

The agent for service for Defendant, Bay Area Healthcare Group, LTD., d/b/a/ Corpus Christi Medical Center, is a Limited Partnership authorized to do business in the State of Texas, and was in fact doing business in the State of Texas on the date of the incident made the basis of this lawsuit, and service may be had on Prentice-Hall Corporation Systems, 800 Brazos, Austin, Travis County, Texas 78701, the registered agent for service.

## II.

## <u>CAUSE OF ACTION NO. 1:</u>

<u>AN ACTION TO RECOVER DAMAGES BY REASON OF AN INJURY WHICH PLAINTIFF RECEIVED IN THE COURSE AND SCOPE OF HER EMPLOYMENT FOR DEFENDANTS ON FEBRUARY 7, 1998, SEPTEMBER 29, 1998, AND JANUARY 16, 1999.</u>

-2-

On or about February 7, 1998, September 29, 1998, and January 16, 1999, while working in the course and scope of her employment for Defendants, at said Defendant's medical facility located at 6226 Saratoga, Corpus Christi, Nueces County, Texas 78414, Plaintiff was injured when working with violent inmates of said hospital when she attempted to control and assist these violent inmates. The negligent acts and omissions which proximately caused Plaintiff's injuries and damages constituted negligence as hereinafter set out:

1.  In failing to have sufficient employees on the floor at the time of Plaintiff's injuries so that at least two employees would be available to control each violent inmate.

2.  In failing to warn Plaintiff and other employees that they should not attempt to restrain, and assist violent inmates by themselves.

### III.

### INJURIES AND DAMAGES

As a result of the injuries hereinabove described, Plaintiff suffered severe injuries to the muscles, nerves, and bones of her back causing a condition known as Left Sacroiliac Joint Dysfunction and/or Protruded or Herniated Disk. She has incurred large bills for medical treatment to date, and in all reasonable probability will require large medical bills for treatment of her medical bills in the future.

As a result of her injuries she has had loss of income to date and has had loss of earning capacity in the future. She has undergone severe physical pain and mental suffering in the past, and will continue in all reasonable probability to endure the same in the future. She has had loss of physical capacity, other than earning capacity, in the past and undoubtedly will suffer loss of physical capacity in the future.

Plaintiff is still under the treatment and the full extent of her damages is not yet known and will be shown by amended pleadings, however, it is clear that her damages are within the jurisdictional limits of the Honorable Court.

-3-

## IV.

### SECOND CAUSE OF ACTION:

Defendants, Columbia/HCA Healthcare Corporation, Columbia Bayview Psychiatric Center, and the Bay Area Healthcare Group, Ltd., d/b/a Corpus Christi Medical Center, at the time of Plaintiff's injuries, had no workers' compensation coverage in force that would cover the injuries sustained by Plaintiff, and instead had created a "plan" which provided medical and compensation benefits to Plaintiff, and other employees who suffered injuries in the course and scope of their employment. Such plan provided for payment of Plaintiff's medical expenses, however, Defendant's failed to provide the proper medical treatment for her and continued to fail and refuse to furnish her medical treatment for her injuries.

Defendants, Columbia/HCA Healthcare Corporation, Columbia Bayview Psychiatric Center, and the Bay Area Healthcare Group, Ltd., d/b/a Corpus Christi Medical Center, was named administrator of the "plan" in the suit and its capacity administrator of the "plan" as well as, in its capacity of current corporation and employer of the Plaintiff.

All conditions precedent to the payment by the Defendant, Columbia/HCA Healthcare Corporation, Columbia Bayview Psychiatric Center, and the Bay Area Healthcare Group, Ltd., d/b/a Corpus Christi Medical Center, of Plaintiff's claim to medical benefits under the "plan" have been complied with. Nevertheless, Defendants, Columbia/HCA Healthcare Corporation, Columbia Bayview Psychiatric Center, and the Bay Area Healthcare Group, Ltd., d/b/a Corpus Christi Medical Center, has denied Plaintiff's claim to medical benefits provided under the "plan." Plaintiff has furnished said Defendant's reports by the treating doctors, which show Plaintiff still needs treatment of her injuries. Nevertheless, said Defendant has wrongfully refused to pay for further medical treatment.

By reason of this cause of action, Plaintiff is entitled to recover for the needed medical

-4-

treatment to treat above-described injuries, together with future benefits.  Plaintiff is further entitled to recover punitive damages for said Defendant's willful refusal to pay for medical benefits.

Plaintiff is entitled to recover prejudgment and post-judgment interest.

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that Defendants be cited to appear and answer herein as provided by law and upon final hearing of this cause, Plaintiff recover:

(1)     Judgment against Defendants, jointly and severally, for Plaintiff's damages as hereinabove set forth;

(2)     interest on said judgment at the legal rate from date of judgment;

(3)     prejudgment interest as allowed by law;

(4)     costs of Court; and,

(5)     such other and further relief to which Plaintiff may show herself to be entitled.

Respectfully submitted,

DIANA L. REECE
1007 W. YOAKUM
KINGSVILLE, TEXAS 78363
361/592-6241

BY: _____
DIANA L. REECE, PRO SE
PLAINTIFF

-5-

CAUSE NO. 00-60205-1

DIANA L. REECE
_____
                    **Plaintiff**
COLUMBIA/HCA HEALTHCARE CORP.
COLUMBIA BAYVIEW PSYCHIATR. **Defendant**
CENTER, AND THE BAY AREA HEALTH
CARE GROUP, LTD d/b/a C.C. MED CENTER

IN THE DISTRICT COURT OF
NUECES COUNTY. TEXAS
_____ JUDICIAL DISTRICT

COUNTY COURT-AT-LAW 1
OF NUECES COUNTY, TEXAS

## CIVIL CASE INFORMATION SHEET

This form must be completed and filed with every original petition, and a copy attached to every original petition served. The information should be the best available at the time of filing, understanding that such information may change before trial. This form does not constitute a discovery request, response, or supplementation, and is not admissible at trial.

Service must be obtained promptly. Notice is hereby given as per Rule 165a R.C.P. that any case in which no answer has been filed or default judgment signed SIX (6) MONTHS from filing will be eligible for DISMISSAL FOR WANT OF PROSECUTION.

**Type of Action:** Check all claims pled: [] Commercial  [✓] Personal Injury    [] Death    [] Other

| | | | | |
|---|---|---|---|---|
| [] Account due | [] Defamation | [] Fraud | [] Product Liability | [] Asbestos |
| [] Admiralty | [] Disbarment | [] Garnishment | [] Post Judgment | [] Assault |
| [] Discrimination | [] Injunction/TRO | [] Railroad | [] Ins. bad faith | [] Dram Shop |
| [] Auto | [] DTPA | [] Malicious prosecutio | [] Real Estate | [] Bill of Review |
| [] Employment discharge | [] Malpractice/Legal | [] Sequestration | [] Business dissolution | [] Environmental tort |
| [] Malpractice/Medical | [] Silicone implant | [] Conspiracy | [] Expunction | [] Malpractice/other |
| [] Tax | [] Contract | [] False Imprisonment | [] Name Change | [] Deed restriction |
| [] Foreclosure | [] Note | [] Trespass | [] Declaratory judgment | [] Forfeiture |
| [] Premises liability | [] Workers compensation | | [] Judgment Nisi | [✓] Other |

Has this dispute previously been in the Nueces County Courts? [] NO    [] YES, in the following court: _____

Monetary damages sought:    [] less than $50,000    [✓] greater than $50,000

Desired discovery level:    [] Level 1 (TRCP 190.2)    [✓] Level 2 (TRCP 190.3)    [] Level 3 (TRCP 190.4)*
*A case will remain in Level 1, if applicable, or else Level 2 unless and until the court enters an order establishing a Level 3 discovery plan. See TRCP 190.4 & cmt. o. The court may enter a Level 3 plan sua sponte or the parties may request entry of such a plan by separate motion. Id.

Estimate time needed for discovery: [] 0-3 months    [✓] 4-6 months    [] 7-12 months    [] Other

Estimate time needed for trial: [] 1-2 days    [✓] 3-5 days    [] 6-10 days    [] 7 10 days

Is there a likelihood of experts other than treating physicians or experts on attorney's fees? [] Yes    [✓] No

Is immediate ADR requested?    [] Yes    [✓] No

Name of party filing this cover sheet: Plaintiff

Signature of attorney or pro se filing cover sheet: _Diana L. Reece_
                                Name printed : Diana Reece
                                Phone No.: (361) 592-6241        Bar No.: _____

**FOR COURT USE ONLY:**
    Tract assigned:    [] Track 1    [] Track 2    [] Track 3

    Court Coordinator: _____    Date: _____

FILED - OSCAR SCHTZ
CLERK-DISTRICT COURTS
NUECES COUNTY, TEXAS
BY _____ C
2000 FEB -7 P 2: 10
_____ DPTY

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| DIANA L. REECE,<br>     Plaintiff, | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| V. | § | CIVIL ACTION NO. C-00-112 |
| | § | |
| COLUMBIA/HCA HEALTHCARE | § | |
| CORPORATION, COLUMBIA BAYVIEW | § | |
| PSYCHIATRIC CENTER, AND BAY AREA | § | |
| HEALTHCARE GROUP, LTD. d/b/a | § | |
| CORPUS CHRISTI MEDICAL CENTER, | § | |
| Defendants. | § | |

## AFFIDAVIT OF DEBBIE VOGELSANG

BEFORE ME, the undersigned official, on this day appeared Debbie Vogelsang, who is personally known to me, and first being duly sworn according to law upon her oath deposed and said:

1.      "My name is Debbie Vogelsang. I am over 18 years of age. I have never been convicted of a felony crime, and I am fully competent to make this affidavit. I have personal knowledge of the facts stated herein, and they are all true and correct.

2.      "I am the Employee Health Nurse/Injury Coordinator for Corpus Christi Medical Center, and, as such, I am responsible for and familiar with the existence and implementation of Corpus Christi Medical Center's personnel policies, programs, practices, guidelines, rules, regulations and/or procedures.

3.      "As Employee Health Nurse/Injury Coordinator, I have custody and access to the personnel, employment and employee health records of Corpus Christi Medical Center. Included in those records are the personnel and employment records of Diana Reece. A copy of pertinent portions of those records are attached



EXHIBIT
B

hereto as Exhibits "B-1", "B-2", "B-3" and "B-4" and incorporated by reference. Those records are kept by Corpus Christi Medical Center in the regular course of business, and it was the regular course of business of Corpus Christi Medical Center for an employee or representative of Corpus Christi Medical Center with knowledge of the act, event, condition, or opinion recorded to make the record or to transmit information thereof to be included in such record; and the record was made at or near the time recorded or reasonably soon thereafter.

4.      Plaintiff's employer on February 7, 1998, September 29, 1998, and January 16, 1999 was Columbia Bayview Psychiatric Center, which was owned and operated by Bay Area Healthcare Group, Ltd.

5.      "Columbia/HCA Healthcare Corporation had rejected coverage under the Texas Workers' Compensation Act prior to February 7, 1998, and, thus, was a nonsubscriber to the Act on that date and all pertinent dates subsequent. thereto.

6.      "Diana Reece received notice prior to February 7, 1998, that Columbia/HCA Healthcare Corporation did not cover its employees with insurance under the Texas Workers' Compensation Act.

7.      "Prior to February 7, 1998, Columbia/HCA Healthcare Corporation established the Employee Health and Safety Program Benefit Plan of Columbia/HCA Healthcare Corporation (the "Plan") to provide its employees who elect to participate in the Plan with certain benefits for occupational injuries and illnesses.

8.      "A true and correct copy of the Employee Health and Safety Program Benefit Plan is attached hereto as Exhibit "B-1" and is incorporated herein by reference for all purposes.

9.     "A true and correct copy of the Employee Health and Safety Program Summary Plan Description is attached hereto as Exhibit "B-3" and is incorporated herein by reference for all purposes.

10.     "The Plan is maintained in accordance with the requirements of the Employee Retirement Income Security Act ("ERISA").

11.     "According to its terms, the Plan provides medical benefits and wage replacement benefits to eligible employees who have suffered an injury as defined by the Plan, without proof of negligence pertaining to the cause of the on-the-job accident.

12.     "Participation in the Plan by the employees of Bayview Psychiatric Center is voluntary and does not affect their employment.

13.     "Employees who elect to participate in the Plan do so by submitting and executing an Election to Participate in the Employee Health and Safety Program Benefit Plan of Columbia/HCA Healthcare Corporation.

14.     "As a condition of enrollment and the right to receive benefits under the Plan, participating employees waive their rights under statutory and common law, to bring legal action or to recover judgment against their employer for any work related injury or death they suffer including negligence, in the course and scope of their employment; and, further, employees agree that benefits under the Plan will be their exclusive recovery and sole remedy.

15.     "Execution of the Election to Participate in the Employee Health and Safety Program Benefit Plan of Columbia/HCA Healthcare Corporation is an integral part of the Plan as it constitutes the consideration for receipt of Plan benefits.

16.    "On December 11, 1997, Diana Reece executed the Election to Participate in the Employee Health and Safety Program Benefit Plan of Columbia/HCA Healthcare Corporation.

17.    "A true and correct copy of the Election to Participate in the Employee Health and Safety Program Benefit Plan of Columbia/HCA Healthcare Corporation, executed by Diana Reece, is attached hereto as Exhibit "B-2" and is incorporated herein by reference for all purposes.

18.    "Diana Reece never took any action nor advised Columbia Bayview Psychiatric Center that she wished to rescind her election to participate in the Plan prior to filing suit, much less, prior to her alleged on-the-job injuries of February 7, 1998, September 29, 1998 and January 16, 1999.

19.    "As a result of Diana Reece's claimed on-the-job injury, she received medical and lost wage benefits under the Plan in the approximate amount of $3,792.50.

20.    "Diana Reece has not returned or tendered back any portion of this sum to date."

FURTHER AFFIANT SAYETH NOT.

_Debbie Vogelsang_
**Debbie Vogelsang**

SUBSCRIBED and SWORN TO before me by the said **Debbie Vogelsang** on this the 1st day of _November_, 2000.



SEAL    ELDA GARCIA
MY COMMISSION EXPIRES
March 6, 2001

Notary Public in and for the State of Texas

Affidavit of Debbie Vogelsang                                    Page 4

# COLUMBIA/HCA HEALTHCARE CORPORATION

## EMPLOYEE HEALTH AND SAFETY PROGRAM BENEFIT PLAN

Columbia/HCA Healthcare Corporation has established for its Affiliated Employers, as defined herein and as listed on Exhibit "B," effective as of November 1, 1997, this Plan which provides benefits for Participants who sustain certain accidental on-the-job injuries. Such plan is in compliance with state and federal laws, and in accordance with the following terms and conditions:

### SECTION ONE

### PURPOSE OF THE PLAN

1.1 <u>Designation</u>. The Plan is designated the "Columbia/HCA Healthcare Corporation Employee Health and Safety Program Benefit Plan."

1.2 <u>Purpose</u>. The purpose of the Plan is to provide (i) certain medical benefits for Participants who sustain an occupational Injury or Disease; and (ii) certain short-term wage replacement benefits to Participants who sustain an occupational Injury or Disease.

1.3 <u>Effective Date</u>. The effective date of this Plan is November 1, 1997.

### SECTION TWO

### DEFINITIONS

2.1 "Affiliated Employer" shall mean a corporation which is a separate, but subsidiary corporation of Columbia/HCA Healthcare Corporation. Affiliated Employers include the Employers who have adopted this Plan and its provisions and act as individual Plan Administrators for their employees. The Affiliated Employers are listed in Exhibit "B" of this document.

2.2 "Code" shall mean the Internal Revenue Code of 1986, as amended from time to time. Reference to any section of the Code shall include any successor provision thereto.

2.3 "Company" shall mean Columbia/HCA Healthcare Corporation.

2.4 "Course and Scope of Employment" shall mean an activity that originates in the work, business, trade or profession of an Employer and that is performed by an Employee while solely engaged in or about the furtherance of the affairs or business of an Employer. The term includes activities conducted on the premises of an Employer or at other locations designated by the Employer. This term does not include:

    (a)    a Participant's transportation to and from his place of employment, unless the transportation is furnished as part of the employment arrangement or paid for by the employer, or the means of transportation are under the control of the employer, or the Participant is directed, as part of his or her employment, to proceed from one place to another place.

    (b)    travel by the Participant in furtherance of the affairs or business of an Employer if such travel



EXHIBIT

B-1

is also in furtherance of personal or private affairs of the Participant, unless: (i) the travel to the place of occurrence of the Injury would have been made even had there been no personal or private affairs of the Participant to be furthered by the travel; and (ii) the travel would not have been made had there been no affairs or business of the Employer to be furthered by the travel.

2.5   "Disease" shall mean a disease which is contracted in the course and scope of the Participant's employment. Each occurrence report of occupational disease, i.e. heart attacks, allergies, etc., and subsequent evaluation(s), shall be considered on its medical diagnostic merits as to whether or not an occupational disease as defined in this Section 2.5. exists.

2.6   "Effective Date" shall mean November 1, 1997.

2.7   "Employee" shall mean each person who is solely employed by an Employer in the State of Texas as defined herein, but shall not include any person who performs services for an Employer as an independent contractor or otherwise in a non-employee status.

2.8   "Employer" shall mean the Plan Administrators. An Employee's Employer shall be the entity that provides its federal tax identification number for payroll purposes of the particular Employee.

2.9   "ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time. References to any section of ERISA shall include any successor provision thereto.

2.10   "Injury" shall mean the medical and/or physical condition resulting from an Occurrence. This definition does not include pre-existing medical conditions, once the acute medical/physical episode associated with the Occurrence has been treated; or mental health conditions, other than Posttraumatic Stress Disorder as defined in Section 2.18 and as diagnosed by a Provider.

2.11   "Maximum Medical Improvement" shall mean the point at which a Treating Physician determines that a Participant who suffered an Injury or Disease will not improve substantially as a result of additional medical treatment or physical therapy, or surgical intervention.

2.12   "Modified Duty" shall mean limited duty assigned by the Employer to a Participant according to his physical limitations as identified by the Treating Physician. Modified duty is provided only for occupational Injuries or Diseases and does not guarantee a temporary position or one that is comparable with pre-Injury/Disease job duties or schedules.

2.13   "Occurrence" shall mean an event that occurs in the course and scope of employment, and in the furtherance of the business of the Employer, and that may or may not result in an Employee's Injury or Disease.

2.14   "Participant" shall mean an eligible Employee who satisfies all requirements for participation in the Plan, and whose participation has not been terminated as provided herein.

2.15   "Plan" shall mean Columbia/HCA Healthcare Corporation's Employee Health and Safety Program Benefit Plan as set forth in this document and adopted by its Affiliated Employers, and as hereafter amended.

2

2.16   "Plan Administrator" shall mean each of the Affiliated Employers, Columbia/HCA Healthcare Corporation, listed in Exhibit "B," or their written designee, that could include a committee appointed from time to time by the Affiliated Employer to supervise the administration of the Plan as provided for in Section 6.1 hereof.

2.17   "Plan Year" shall mean the twelve (12) month period ending on the last day of December.

2.18   "Posttraumatic Stress Disorder" shall mean a neurotic disorder produced by exposure to an overwhelming environmental stress and characterized by recurrent episodes of re-experiencing the traumatic event, numbing of emotional responsiveness, and dysphoric general hyper arousal.

2.19   "Pre-existing Condition" shall mean any illness, injury, disease, or other physical or mental condition, whether or not work-related, which originated or existed prior to the date of Occurrence.

2.20   "Provider" shall mean a health care provider (including but not limited to: physician(s), hospitals, physical therapists and pharmacies) designated by the Plan Administrator to administer medical treatment, physical therapy and drugs for which reimbursement is authorized under this Plan.

2.21   "Review Committee" shall mean the committee appointed to review and determine all requests for review of a denial of benefits in accordance with Section 6.7 hereof.  The Review Committee shall consist of three individuals appointed by the Plan Administrator.

2.22   "Sponsor" shall mean Columbia/HCA Healthcare Corporation.

2.23   "Subsidiary" shall mean any branch, division, location, corporation, or other entity owned by the Company.

2.24   "Treating Physician" shall mean the physician who is a Provider and who is, at any particular time, the current physician who has the Participant under his or her care and who is primarily responsible for the Participant's course of medical treatment or physical rehabilitation.

## SECTION THREE

## REQUIREMENTS FOR ELIGIBILITY

3.1   <u>Employer or Affiliated Employer</u>.  The Company allows each Employer or Affiliated Employer to choose between two options for its Employees.  The options for each Employer or Affiliated Employer are as follows:

<u>Option A</u>:  In order to participate in the Plan, an Employee of an Employer or Affiliated Employer must affirmatively elect to participate in the Plan by executing and delivering to the Plan Administrator a written election in the form and on the terms attached hereto as Exhibit "A" and made a part hereof for all purposes.  Under such election the Employee as a condition to participation in the Plan must irrevocably waive, release, covenant not to sue upon, and assign to the Company and/or Employer or Affiliated Employer all rights that the employee and his/her heirs, beneficiaries or assigns have for recovery against the Company and/or Employer or Affiliated Employer, their directors, officers, shareholders, employees and agents

3

for injuries, diseases and/or death sustained by the Employee      .ch waiver, release, covenant and assignment are in exchange for the benefits provided herein, and shall be in accordance with such Exhibit "A."

Option B: An Employer or Affiliated Employer will implement the Plan, providing benefits to its individual Employees, without requiring an election of benefits and the waiver of liability.

Each Employer or Affiliated Employer must select Option A or Option B prior to the expiration of thirty (30) days of its Employees becoming eligible for participation under this Plan.

3.2 Eligibility to Participate. Each Employee who was an Employee on the Effective Date shall be eligible to participate in the Plan. Each other Employee shall be eligible to participate in the Plan as of the later of (i) the date he/she is employed by the Employer, or (ii) the date on which he/she is classified as an Employee.

3.3 Cessation of Participation. A Participant will cease to be a Participant in the Plan as of the earlier of (i) the date on which the Plan is terminated, or (ii) the date on which the Participant is no longer an Employee.

3.4 Reinstatement of Former Participant. A former Participant will become a Participant again in the Plan when he or she again satisfies all the participation requirements.

## SECTION FOUR

## BENEFITS

4.1 Eligibility for Benefits. A Participant shall only be eligible for payment of benefits as described below if the Participant sustains an Injury or Disease as the result of an Occurrence and if the Participant follows the procedures and policies set forth in Section Five below.  To receive benefits under this Plan, a Participant must utilize a Provider, except as provided in Section 4.7.

4.2 Medical Benefits. Medical benefits under this Plan attributable to a Participant's Injury or Disease will be one hundred percent (100%) of all reasonable and necessary charges for hospital confinement, physician(s) services, prescription drugs and physical rehabilitation, necessary as a result of an Injury or Disease, and provided by a Provider approved by the Plan Administrator. The Plan Administrator will determine whether charges for hospital confinement, physician(s) services, prescription drugs, physical rehabilitation, emergency room and/or out-patient services are reasonable and necessary.

Medical benefits will continue until the earlier of (i) the Participant reaches Maximum Medical Improvement; (ii) the Plan Administrator determines that benefits should be terminated in accordance with this Plan, including without limitation the Participant's failure to comply with this Plan; (iii) the Plan is terminated; and/or (iv) the Participant ceases to be an Employee.

4.3 Wage Replacement Benefits. Wage replacement benefits attributable to an Occurrence shall be paid only if a Participant has been ordered by the Treating Physician not to return to full or modified duty work and only as follows:

4

(a)  For non-exempt Participants, from the time the Treating Physician orders the Participant not to return to work forward, the wage replacement benefits are 100% of the Participant's average hourly base wages for the previous 13 weeks, multiplied by the average number of hours that the Participant worked in each of the previous 13 weeks, not to exceed 40 hours per week (and not to include overtime, shift differential, premium or bonus pay) for the first 30 calendar days of lost time. If the Participant has not worked at least 13 weeks prior to the Occurrence, the calculation will be performed as set forth above, based on the number of work weeks completed by the Participant, or as may be otherwise determined by the Plan Administrator. At the end of the first 30 day period, the Participant will receive 90% of his/her average hourly base wages as calculated above, until the end of the wage continuation period, as set forth in (c) below.

For exempt Participants, from the time the Treating Physician orders the Participant not to return to work forward, the wage replacement benefits are 100% of the Participant's average salary received for the previous 13 weeks for the first 30 calendar days of lost time. If the Participant has not worked at least 13 weeks prior to the Occurrence, the calculation will be performed as set forth above, based on the number of work weeks completed by the Participant, or as may be otherwise determined by the Plan Administrator. At the end of the first 30 day period, the Participant will receive 90% of his/her average salary as calculated above, until the end of the wage continuation period as set forth in (c) below.

(b)  Benefit checks will be made available to Participants entitled to benefits hereunder on regularly scheduled pay days.

(c)  Wage replacement benefits shall cease at the end of the earlier of (i) the date at which the Participant reaches Maximum Medical Improvement; (ii) when the Participant is released by the Treating Physician to return to full or part-time work whether regular or modified duty; (iii )the Plan Administrator determines that benefits should be terminated in accordance with this Plan, including without limitation the Participant's failure to comply with this Plan; (iv) the Plan is terminated; and/or (v) the Participant ceases to be an Employee.  If a Participant returns to part-time work, the Participant's wage replacement benefits will be the difference between the amount that the Participant would have been entitled to receive under Section 4.3(a) above if the Participant had been ordered by the Treating Physician not to return to work, and the amount of the Participant's hourly base wages or salary as the case may be resulting from such part-time work.

4.4  Modified Duty.  When a Participant is given a release to work with restrictions (modified duty) subsequent to an Occurrence, the Participant's supervisor, in coordination with the Employee Health Nurse will determine what work is available and will attempt to place the Participant according to his limitations as identified by the Treating Physician. Such work may not be on a Participant's usual scheduled days, his usual scheduled shift or involve his regular job duties. A Participant returned to modified duty will receive 100% of his base pay as calculated above. Modified duty applies only to occupational Injuries or Diseases otherwise covered by this Plan.

Modified duty may be provided, at the option of the Plan Administrator, until the earlier of (i) the Participant is released by the physician approved by the Plan Administrator to return to full duty work; (ii) the Participant reaches Maximum Medical Improvement; (iii) the Plan Administrator determines

5

that benefits should be terminated in accordance with this Plan, including without limitation the Participant's failure to comply with this Plan; (iv) the Plan is terminated; and/or (v) the Participant ceases to be an Employee.

4.5   <u>Permanent Total Disability Benefits</u>.  In the case of a Participant's permanent total disability, which means that the Provider has determined that the Participant has reached maximum medical improvement and can no longer perform on a regular basis the essential duties as described in the job description, with or without reasonable accommodations, there are no guaranteed benefits.  However, a settlement will be offered to the Participant.

4.6   <u>Death Benefits</u>.  In the case of a Participant's death caused by an Occurrence, there are no guaranteed benefits.  However, a settlement will be offered to the Participant's beneficiaries.

4.7   <u>Providers</u>.  An Affiliated Employer may designate one or more Providers to administer medical treatment to Participants, and an Affiliated Employer may change designated Providers at any time.  At a Participant's request, any health care provider which has not been designated as a Provider may be approved by the Plan Administrator, prior to the time a Participant incurs an expense which is payable or reimbursable under the Plan.  A Provider will be reimbursed for treatment to a Participant, only when the Participant submits to the Provider at the time of treatment the physician's authorization and report form provided by the Affiliated Employer.  Notwithstanding the foregoing, a health care provider which has not been approved with the Authorization forms as a Provider may be utilized to provide emergency medical treatment if an Injury occurs when the Participant is not at his or her regular place of employment or if an emergency vehicle takes the injured Participant to a health care provider which has not been designated as a Provider.  Any continued medical treatment after emergency medical treatment, however, shall be administered by a designated Provider.  Except as provided above, benefits shall not be paid under this Plan for treatment received from a health care provider not first approved as a Provider in accordance with this Plan.  Notwithstanding anything contained in this Plan to the contrary, the Employer or an Affiliated Employer, their officers, directors, shareholders, employees and agents shall have no liability for any actions or omissions of any Provider designated by the Affiliated Employer.

4.8   <u>Liability for Benefits</u>.  Any amounts to be paid to a Participant hereunder shall be paid only by the entity actually employing such Participant and neither the Sponsor or any Affiliated Employer shall have any obligation, liability or responsibility to pay such amounts.

4.9   Benefits under this Section Four are contingent upon Participant's compliance with Section Five and other miscellaneous requirements in the Plan.

SECTION FIVE

REQUIREMENTS FOR RECEIPT OF BENEFITS

In order to receive payment of any benefits under this Plan, a Participant must comply with all requirements of this Section Five.

5.1   <u>Reporting</u>.  In the event of a work-related on-the-job occurrence, the Participant must notify his/her Supervisor or, in his/her absence, the Department Manager immediately (or no later than the shift in

6

which the occurrence occurred). If it is after hours or on the weeke...d, the Participant must notify his/her Supervisor or, in his/her absence, the House Supervisor. The Participant must also complete an Occurrence Report by signing, dating and turning it in to his/her Supervisor before leaving the premises. During normal business hours, the Employee Health Nurse (if it is after hours or on the weekend, the House Supervisor) will assist the Participant in obtaining necessary medical treatment from a Provider. The Employee Health Nurse will then assist the Participant in obtaining required report forms which the Participant must complete and file with the Employee Health Nurse/Injury Coordinator. Immediately after primary medical treatment and after each succeeding appointment with the Provider, the Participant must return the Physician's Report to the Employee Health Nurse. The Employee Health Nurse will work in coordination with the Human Resources Director/Injury Coordinator/Designated Person in charge of the Employee Health and Safety Program Benefit Plan for on-going status of the Participant's medical care. The Employer, Affiliated Employer or Plan Administrator shall be entitled to obtain records, consultation, prognosis and return to work information from the Treating Physician or any Provider. This provision authorizes the foregoing receipt of records and communications by the Participant; this is also evidenced by the Release of Medical Records for Health Care Benefits, as required to be signed by a Participant.

5.2     <u>Medical Treatment</u>. The Participant must follow fully and completely the advice of and/or the course of medical treatment prescribed by the Treating Physician, and keep all scheduled appointments to fulfill the prescribed medical treatment plan. The Participant may be required to submit to drug and/or alcohol testing by the Treating Physician at anytime during the receipt of benefits under this Plan; however, this does not have any effect on the Employer's Drug Free Workplace or related policy.

5.3     <u>Benefits Eligibility Requirements</u>. If the Participant fails to comply with any of the following requirements, the Participant's eligibility for payment of benefits including total permanent disability or death shall immediately terminate:

(a)     If the alleged disease, or the alleged injury, is not a Disease or an Injury as defined in this Plan in accordance with Sections 2.5 or 2.10 above; or if the alleged disease, or the alleged injury is discovered to have been intentional, self-inflicted, whether sane or insane, feigned, or an attempt to defraud the Employer, or if the alleged disease, or the alleged injury, was a complication of a pre-existing condition that was not a Disease or Injury.

(b)     If the Participant fails to comply with any of the requirements or provisions of the Plan.

(c)     If the occurrence is not reported to the Participant's Supervisor or the Department Manager/House Supervisor/Employee Health Nurse/Injury Coordinator/Human Resources Director/Designated Person in charge of the Employee Health and Safety Program Benefit Plan immediately (or no later than the shift on which the occurrence happened).

(d)     If the Participant fails to complete an Employee Occurrence Report by dating, signing and giving it to his/her Supervisor or the Department Manager/House Supervisor/Employee Health Nurse/Injury Coordinator/Human Resources Director/Designated Person in charge of the Employee Health and Safety Program Benefit Plan immediately or no later than the shift on which the occurrence occurred; or if the Participant fails to provide a complete statement, affidavit, or deposition upon request by the Plan Administrator concerning the occurrence which the Participant believes resulted in an Injury or Disease.

7

(e)    if the Participant uses an unauthorized Provider in a non-emergency situation without prior approval from the Plan Administrator or designee.

(f)    If the Participant fails to follow the directions of the Treating Physician or Provider in accordance with Section 5.2 above.

(g)    If the Participant fails to report to his or her Department Manager/Employee Health Nurse/Human Resources Director or Designated Person in charge of the Employee Health and Safety Program for work upon being released for full or modified duty by the Treating Physician, as specified in the release.

(h)    If the Participant refuses to submit to drug and/or alcohol testing as required under Section 5.2 above, or if the Participant was in violation of the Employer's Drug-Free Workplace Policy (or drug and alcohol policy) at the time of the Occurrence or any time thereafter.

(i)    If the Participant was untruthful in regard to any aspect of the required information supplied as part of the employment process.

(j)    If the Participant's Injury or Disease resulted from the Participant's own reckless behavior or horseplay; reckless behavior can include failure to follow mandatory safety rules and/or repeated failure to follow one or more safety practices as specified in the <u>Employee Guide to Health and Safety</u>, the video, *"Safety Begins With You"* or any replacement or supplementary safety policies and/or manuals of the Employer.

(k)    If the Participant is or becomes self-employed or employed by another employer and performs duties that exceed the Provider's restrictions.

(l)    If the Participant voluntarily participates in any off-duty recreational, social, athletic or other activity that exceeds the Provider's restrictions.

(m)    If the Participant fails to cooperate in regard to communications with, or instructions provided by, the Employer and/or its designee, i.e., the designated person in charge of the Employee Health and Safety Program Benefit Plan.

(n)    If the Participant is in violation of the Election to Participate Form ("Exhibit A") (Option A), by filing a lawsuit for negligence against the Company and/or the Plan's Administrator , Employer and/or Affiliated Employer seeking damages that would be provided under this Plan.

(o)    If the Participant (under Option B) files a lawsuit for negligence against the Company and/or the Plan's Administrator, Employer or Affiliated Employer seeking damages that would be provided under this Plan.

(p)    If the Occurrence, based on a preponderance of evidence, was caused by the negligence of a third party.  This provision is subject to Section 5.4 of the Plan.

(q)    If the Participant's employment terminates.

(r)     If the treating physician determines that the Participant has reached Maximum Medical Improvement or such earlier time as set forth herein.

(s)     If the Plan terminates.

5.4    Subrogation. If the Participant's Injury, Disease or Death is caused by a third party's wrongful act or negligence, the following provisions shall apply.

(a)     In order to receive any Plan benefits for that Injury, Disease or Death, the Participant or the Participant's legal representative (or in the case of the Participant's death, the Participant's estate) agrees in writing by participating in this Plan:  i)  that the Employer (as the source for payment of benefits under the Plan) will have subrogation rights to any recovery (irrespective of whether there is recovery from the third party of the full amount of all claims against the third party) or right of recovery against that third party; ii)  not to take any action which would prejudice the Employer's subrogation rights; iii)  to cooperate in doing what is reasonably necessary to assist the Employer in any recovery, including, but not limited to, signing and delivering documents to evidence or secure the right of recovery; and iv)  to include in any liability claim against any third party any benefits payable to or on behalf of the injured party under this Plan.

(b)     The Employer will have subrogation rights only to the extent of the Plan benefits paid because of that Injury, Disease or Death.

(c)     Subrogation rights of the Employer under this Section will not be jeopardized merely because the Employer fails to recognize its right of subrogation until after paying Plan benefits or if the Employer recognizes its right of subrogation, but fails to obtain the necessary consent before paying Plan benefits.  Any Plan benefits paid the Participant, his legal representative, or his estate must be returned to the Employer immediately in the event the Employer requests the agreement provided for herein and the recipient of such Plan benefits fails or refuses to execute or comply fully with such agreement.

(d)     The Participant, by participation in this Plan, agrees that his or her estate, and the legal representative of such estate, shall be obligated to agree that the Employer will have subrogation rights to any recovery or right of recovery the estate has against any third party with respect to the Injury or Disease or with respect to any wrongful death claim or action.

5.5    Coordination of Benefits.  If any Participant is covered under one or more other insurance policies, including, but not limited to, disability insurance, automobile insurance, etc., or any other plans or programs, including, but not limited to, other health or disability benefit plans, Social Security or other government programs, the benefits payable under Section Four will  be reduced by an amount such that the benefits payable under this Plan, when added to the benefits of other plans or programs, will not exceed 100% of the benefits to be provided under Section Four.  The purpose of this provision is to prevent duplicate payments which would exceed 100% of the actual medical expenses or the other benefits provided hereunder.

<u>SECTION SIX</u>

<u>ADMINISTRATOR</u>

6.1   <u>Affiliated Employer Designation</u>.   The Plan Administrator shall be designated in writing by the Affiliated Employer.  In the event the Affiliated Employer does not designate a Plan Administrator, the Affiliated Employer shall itself act as Plan Administrator.

6.2   <u>Resignation or Removal</u>.  A Plan Administrator may resign upon thirty (30) days prior written notice to the Affiliated Employer.  An Affiliated Employer may remove any Plan Administrator by giving one (1) day written notice in advance to the acting Plan Administrator.  In the event of the resignation or removal of a Plan Administrator, the Affiliated Employer may act as Plan Administrator or shall appoint a successor Plan Administrator.  During any period in which selection of a Plan Administrator is pending, the Affiliated Employer shall act as Plan Administrator.

6.3   <u>Rights and Duties</u>.  The Plan Administrator is authorized to take such actions as may be necessary to carry out the provisions and purposes of the Plan and shall have the authority to control and manage the operation and administration of the Plan.  In order to effectuate the purposes of the Plan, the Plan Administrator shall have the sole and absolute discretionary power and authority to construe and interpret the Plan, to supply any omissions therein, to reconcile and correct any errors or inconsistencies, to decide any questions in the administration and application of the Plan, (including, but not limited to, determining (i) eligibility for participation, (ii) whether an injury constitutes an Injury, (iii) whether a disease constitutes a Disease, (iv) whether expenses are reasonable and customary, (v) the eligibility of expenses for reimbursement under the Plan, and (vi) whether a Participant has complied with all Plan requirements); and to make equitable adjustments for any mistakes or errors made in the administration of the Plan.  Further, the Plan Administrator is entitled to determine eligibility for benefits and to resolve factual issues which arise in connection with Plan interpretation or benefit eligibility decisions.  Except as required by Section 6.7 and ERISA, all such actions or determinations made by the Plan Administrator, and the application of rules and regulations to a particular case or issue by the Plan Administrator, in good faith, shall not be subject to review by anyone, but shall be final, binding and conclusive on all persons ever interested hereunder.  In construing the Plan and in exercising its power under provisions requiring Plan Administrator approval, the Plan Administrator shall attempt to ascertain the purpose of the provisions in question and when such purpose is known or reasonably ascertainable, such purpose shall be given effect to the extent feasible.  Likewise, the Plan Administrator is authorized to determine all questions with respect to the individual rights of all Participants and Employees under this Plan.  The Plan Administrator shall have all powers necessary or appropriate to accomplish his duties under this Plan including, but not limited to, the power and duty:

(a)   To maintain complete and accurate records of all Plan transactions.  The Plan Administrator shall maintain the books and accounts, records, and other data in the manner necessary for proper administration of the Plan and to meet any applicable disclosure and reporting requirements of ERISA;

(b)   To adopt rules of procedure and regulations necessary for the proper and efficient administration of the Plan, provided such rules and regulations are not inconsistent with the terms of the Plan as set out herein.  All rules and decisions of the Plan Administrator shall be uniformly and consistently applied to all Participants in similar circumstances;

10

(c)     To enforce the terms of the Plan and the rules and regulations it adopts;

(d)     To review claims and render decisions on claims for benefits under the Plan;

(e)     To furnish the Participants, upon request or as required by law, with information which the Employer or the Participants may require for tax or other purposes;

(f)     To employ agents, attorneys, accountants or other persons (who also may be employed by or represent the Affiliated Employer) for such purposes as the Plan Administrator considers necessary or desirable in connection with his duties hereunder; and

(g)     To perform any and all other acts necessary or appropriate for the proper management and administration of the Plan.

6.4     Indemnification of Individual Administrators.  As permitted by law and as limited by any agreement in writing between the Affiliated Employer and a Plan Administrator, individual Plan Administrators of this Plan shall be indemnified by the Employer against any and all liabilities arising by reason of any act or failure to act made in good faith and pursuant to the provisions of the Plan, including expenses reasonably incurred in the defense of any claim relating thereto.

6.5     Non-discriminatory Exercise of Authority.   Whenever, in the administration of the Plan, any discretionary action by the Plan Administrator is required, the Plan Administrator shall exercise its authority in a non-discriminatory manner so that all persons similarly situated will receive substantially the same treatment.

6.6     Named Fiduciaries and Allocation of Responsibility.  ERISA requires that certain persons, who are deemed to be "fiduciaries" as defined in Section 3(21)(A) of ERISA, be designated as "Named Fiduciaries" in the Plan.  The Plan Administrator is hereby designated the Named Fiduciary.  The Named Fiduciary shall have only the powers, duties and responsibilities specifically allocated to such fiduciary pursuant to the terms of this Plan or delegated by the Affiliated Employer and accepted in writing by the Plan Administrator.  The Named Fiduciary may, by written instrument, allocate some or all of such Named Fiduciary's responsibilities to another fiduciary or designate another person to carry out some or all of such Named Fiduciary's fiduciary responsibilities.  The Plan Administrator and each other fiduciary to whom responsibilities are allocated by the Plan Administrator will be furnished a copy of the Plan and their acceptance of such responsibility will be made by agreeing in writing to act in the capacity designated.  No Named Fiduciary shall be liable for an act or omission of any person (who is allocated a fiduciary responsibility or who is designated to carry out such responsibility) in carrying out a fiduciary responsibility except to the extent that the Named Fiduciary did not act in accordance with the standard contained in Section 404(a) of ERISA with respect to the allocation or designation, continuation thereof, or implementation or establishment of the allocation or designation procedures.  Any person or group of persons may serve in more than one fiduciary capacity with respect to the Plan.

6.7     Review Procedures Under ERISA.

(a)     Notification.  If any benefits under the Plan are wholly or partially denied, the Plan Administrator/Designee will notify the Participant (or the Participant's estate) of its decision in writing.  Such notification will be written in a manner calculated to be understood by the

11

Participant (or the Participant's estate) and will contain (i) specific reasons for the denial, (ii) specific reference to pertinent Plan provisions, (iii) a description of any additional material or information necessary for the Participant (or the Participant's estate) to provide an explanation of why such material or information is necessary, and (iv) information as to the steps to be taken if the Participant (or the Participant's estate) wishes to submit a request for review.

(b)   Review Procedure.  Within sixty (60) days after the date on which the Participant (or the Participant's estate) receives a written notice of a denial of benefits (or, if applicable, within sixty (60) days after the date on which such denial is considered to have occurred), if the Participant (or the Participant's estate) disagrees with the denial of a request for benefits, or continued benefits, the Participant (or the Participant's estate) (or his duly authorized representative) shall (i) file a written request with the Plan Administrator for a review of the denied request for benefits and of pertinent documents, and (ii) submit written issues and comments to the Plan Administrator.  The Plan Administrator will notify the Participant (or the Participant's estate) of the Review Committee's decision in writing.  Such notification will be written in a manner calculated to be understood by the Participant (or the Participant's estate) and will contain specific reasons for the decision as well as specific references to pertinent Plan provisions.  The decision on review will be made within sixty (60) days after the request for review is received by the Review Committee (or within one hundred twenty (120) days, if special circumstances require an extension of time for processing the request, such as the decision by the Review Committee to hold a hearing or the inability to timely obtain all necessary records, independent medical assessments or necessary cooperation from the Participant, and if written notice of such extension and circumstances is given to the Participant (or the Participant's estate) within the initial sixty (60) day period).  All reviews will be based on written appeal materials submitted by Participant along with any other documentation gathered by the Plan Administrator and/or Review Committee.  The Participant (or representative of his or her estate) and an authorized representative (if so desired) are entitled to be present and heard if any hearing is used as part of the review.  If the decision on review is not made within such period, the request for benefit will be considered denied.  No legal action can be brought to recover benefits before the claims review process has been exhausted.

6.8   Questions about rights under ERISA, should be directed to the nearest Area Office of the U.S. Labor-Management Services Administration, Department of Labor at 525 S. Griffin, Dallas, TX 75202, (214) 767-6831.

## SECTION SEVEN

## FUNDING

7.1   Non-Insured, Non-Funded Benefits.  Payments of all benefits under this Plan with respect to each Participant shall be made solely out of the general assets of such Participant's Employer and are not guaranteed under a policy associated with this Plan.  This Plan is a non-funded occupational welfare benefit plan for eligible Texas Employees.

7.2   Obligation to Insure or Fund Benefits.  The Employer shall have no obligation, but shall have the right, to obtain insurance contracts with one or more insurers in order to provide funds to the Employer to pay certain benefits in connection with its liability arising under this Plan.  Any such insurance contract shall be owned by the Employer which applied for the contract, and no Participant shall have any

interest in or right to any benefits payable under such contract. The Employer shall have no obligation to establish any fund or trust for the payment of benefits under this Plan.

## SECTION EIGHT

## AMENDMENT OR TERMINATION

8.1   <u>Amendment</u>.  The provisions of this Plan may be amended at any time and from time to time by the Company; provided, however, that a summary of any material reduction in covered services or benefits is provided to Participants within sixty (60) days of adoption of those changes.

8.2   <u>Term of Plan</u>.  This Plan may be terminated by the Company or Employer at any time, provided that the Company or Employer has sent each Participant written notice of its intention to terminate at least thirty days prior to such termination date.

## SECTION NINE

## ADOPTION OF PLAN BY AFFILIATES

9.1   <u>Adoption Procedure</u>.  Any subsidiary or affiliate of the Company may become an Affiliated Employer under the Plan provided that:

(a)   The Company approves the adoption of the Plan by the subsidiary or affiliate and designates such subsidiary or affiliate as an Employer;

(b)   The subsidiary or Affiliated Employer adopts the Plan together with all amendments then in effect by appropriate resolutions of the Board of Directors of the subsidiary or affiliate; and

(c)   The subsidiary or affiliate by appropriate resolutions of its Board of Directors agrees to be bound by any other terms and conditions which may be required by the Board of Directors of the Company, provided that such terms and conditions are not inconsistent with the purposes of the Plan.

9.2   <u>Effect of Adoption by Affiliated Employer</u>.  Any subsidiary or affiliate of the Company which adopts the Plan pursuant to Section 9.1 shall be deemed to be an Employer for all purposes hereunder, unless otherwise specified in the resolutions of the Board of Directors of the Company designating the subsidiary or affiliate as an Employer.

9.3   <u>Obligations of Employer</u>.  Each Employer shall pay any amounts necessary to fund any benefits hereunder for its Participants.  Each Employer shall keep such records and furnish such information with respect to its Employees as the Plan Administrator shall require.  Each Employer may be required to pay its pro rata share of the costs of administering this Plan and benefits hereunder.

9.4   <u>Withdrawal</u>.  Any Employer by action of its Board of Directors or other governing authority and notice of at least thirty (30) days to the Company may withdraw from the Plan at any time without affecting other Employers not withdrawing.  A withdrawing Employer may arrange for the continuation by itself or its successor, of the Plan in separate form for its own Employees, with such amendments, if any, as it may deem proper.  The Company may, in its absolute discretion, terminate an Employer's participation at any time when in its judgment such Employer fails or refuses to discharge its obligation

13

under the Plan   Withdrawal from the Plan by an Employer or ᴠ..mination of the Employer's participation by the Company shall not affect the continued operation of the Plan with respect to the Company and other Employers.

9.5   Limitation of Liability.  In the event that this Plan is adopted by more than one Employer, benefits shall be paid solely by the Employer that employed the Participant at the time that the Occurrence occurred to which benefits are attributable.  No Employer shall have any liability, obligation or responsibility to pay any amounts under this Plan to Participants that are employed by another Employer.

## SECTION TEN

## MISCELLANEOUS

10.1   Nonalienation of Benefits.  None of the payments, benefits, or rights of any Participant shall be subject to any claim of any creditor, and, in particular, to the fullest extent permitted by law, all such payments, benefits, and rights shall be free from attachment, garnishment, trustee's process, or any other legal or equitable process available to any creditor of such Participant.  No Participant shall have the right to alienate, anticipate, pledge, encumber, or assign any of the benefits or payments which he or she may expect to receive, contingently or otherwise, under this Plan.

10.2   Taxation of Benefit Payments.  Benefit payments under this Plan shall be reduced by the amount of any applicable federal or state income, employment or other taxes which are required by law to be withheld.

10.3   No Contract of Employment.  Neither the establishment of this Plan nor any modification thereof, nor the creation of any fund, trust or account, nor the payment of any benefits shall be construed as giving any Employee, or any person whomsoever, the right to be retained in the service of the Employer, and all Employees shall remain subject to discharge to the same extent as if the Plan had never been adopted.

10.4   Severability of Provisions.  If any provision of this Plan shall be held invalid or unenforceable, such invalidity or unenforceability shall not affect any other provision hereof, and this Plan shall be construed and enforced as if such provisions had not been included.

10.5   Heirs, Assignees, And Personal Representatives.  This Plan shall be binding upon the heirs, executors, administrators, successors, and assignees of the parties, including each Participant, present and future.

10.6   Headings And Captions.  The headings and captions herein are provided for reference and convenience only, shall not be considered part of the Plan, and shall not be used in the construction of the Plan.

10.7   Gender and Number.  Except where otherwise clearly indicated by context, the masculine and the neuter shall include the feminine and the neuter, the singular shall include the plural, and vice-versa.

10.8   Controlling Law.  This Plan shall be construed and enforced pursuant to federal law under ERISA and is meant to be an unfunded employee welfare benefit plan as defined in Section 3(1) of ERISA.

10.9   Title To Assets.  No Participant shall have any right to, or interest in, any assets of the Company or the Employer upon termination of his or her employment or otherwise, except  as provided from time to time under this Plan.

14

10.10 <u>Expenses</u>.  All expenses for the management and administration of the Plan shall be paid     by the Employer.

    10.11 <u>No Admission of Liability</u>.  Payments made under this Plan by an Employer shall not in   any way constitute an admission of liability or responsibility by an Employer for any        Injury, Disease or Death, and any such liability or responsibility is specifically denied.

10.12 <u>No Collateral Source</u>.  Benefit payments under the Plan shall be considered to be made      by the Employer of a Participant and shall not be considered payment from a collateral     source as that term is defined by rules, statutes, judicial decisions or directives.  All benefits paid under this Plan shall be offset against any judgment against the Company and/or Plan Administrator or Affiliated Employer, their officers, directors, or agents which may be taken by a Participant or Participant's beneficiaries, heirs, or assigns, resulting from an occupational injury, disease or death.

10.13 <u>Revocation of All Plans</u>.  By adopting this Plan, the Employer revokes and terminates all    o t h e r plans, agreements, or arrangements of any nature whatsoever whereby any Employee may be entitled to receive any benefits as a result of a job-related injury, disease or death.  Such revocation, however, excludes those Participants who are  receiving benefits, on the effective date of this Plan, under a prior Plan.  Such Participants shall be entitled to continue to receive benefits as set forth in the Plan under which their benefits are being provided; and, in accordance with the terms and conditions of that Plan.

    DATED as of the ___ day of _____, 1997.

                 COLUMBIA/HCA HEALTHCARE CORPORATION

                 By _____
                 Its _____

## EXHIBIT "A"

### ELECTION TO PARTICIPATE IN THE
### EMPLOYEE HEALTH AND SAFETY PROGRAM BENEFIT PLAN OF
### COLUMBIA/HCA HEALTHCARE CORPORATION

**EXECUTION OF THIS DOCUMENT INVOLVES THE WAIVER AND RELEASE OF VALUABLE LEGAL RIGHTS.**

I understand that Columbia/HCA Healthcare Corporation and its Affiliated Employers, as listed on Exhibit "B," do not subscribe to the Texas Workers' Compensation Act; and, instead, Columbia/HCA Healthcare Corporation has established an Employee Health and Safety Program Benefit Plan ("Plan") that has been adopted by its Affiliated Employers. I understand that under the Plan and under certain conditions, subsequent to a work-related, on-the-job injury, certain medical treatment and certain wage replacement benefits will be provided only to those employees who voluntarily elect to participate in the Plan.

I have had explained to me and understand that I have a right not to participate in the Plan and retain the right to sue and pursue my common law rights and, in doing so, I would not receive any occupational benefits if I am injured on the job. If I choose not to enroll in the Plan, I understand I am entitled to bring legal action against Columbia/HCA Healthcare Corporation and/or an Affiliated Employer. If I prevail, I will recover judgment against Columbia/HCA Healthcare Corporation and/or an Affiliated Employer for any damages sustained by reason of any personal injury received in the course of my employment, or by reason of death resulting from my injury. I also understand that in such an action, Columbia/HCA Healthcare Corporation and/or an Affiliated Employer cannot use as a defense that I am guilty of contributory negligence, that the injury or death was caused by negligence of a fellow employee, or that I had assumed the risk of injury or death. However, I have had explained to me that Columbia/HCA Healthcare Corporation and/or an Affiliated Employer may defend such an action on the ground that the injury was caused by the willful intentional act of me or was so caused while I was in a state of intoxication.

By execution of this document, I hereby voluntarily elect to participate in the Employee Health and Safety Program Benefit Plan of Columbia/HCA Healthcare Corporation (the "Plan"). **AS REQUIRED BY THE TERMS OF THE PLAN, I, THE UNDERSIGNED, AND ON BEHALF OF MY HEIRS AND ASSIGNS, HEREBY FREELY, IRREVOCABLY AND UNCONDITIONALLY RELEASE, WAIVE AND AGREE NOT TO SUE UPON, ANY AND ALL CLAIMS AND CAUSES OF ACTION, WHETHER NOW EXISTING OR ARISING IN THE FUTURE, THAT I, MY HEIRS OR ASSIGNS MAY HAVE AGAINST COLUMBIA/HCA HEALTHCARE CORPORATION, ITS AFFILIATED EMPLOYERS, THEIR SUBSIDIARIES, THEIR OFFICERS, DIRECTORS, SHAREHOLDERS, AGENTS AND EMPLOYEES, THAT ARISE OUT OF OR ARE RELATED TO INJURIES OR DEATH SUSTAINED BY ME IN THE COURSE AND SCOPE OF MY EMPLOYMENT BY COLUMBIA/HCA HEALTHCARE CORPORATION AND/OR AN AFFILIATED EMPLOYER AND ARE CAUSED BY THE SOLE NEGLIGENCE OF COLUMBIA/HCA HEALTHCARE CORPORATION AND/OR AN AFFILIATED EMPLOYER OR THE NEGLIGENCE OF COLUMBIA/HCA HEALTHCARE CORPORATION AND/OR AN AFFILIATED EMPLOYER CONCURRENT WITH THE NEGLIGENCE OF ANY OTHER PERSON OR ENTITY.** In the event the Plan is terminated, the foregoing release and waiver, and agreement not to sue upon, shall not apply in connection with injuries or death caused by events that occur entirely after the date of termination of the Plan.

**I UNDERSTAND THAT BY EXECUTION OF THIS DOCUMENT, I, MY HEIRS AND ASSIGNS WILL LOSE THE RIGHT TO SUE COLUMBIA/HCA HEALTHCARE**

Initials

EXHIBIT
B-2

CORPORATION AND ITS AFFILIATED EMPLOYERS AND PEOPLE EMPLOYED BY IT/THEM IN CONNECTION WITH INJURIES OR DEATH SUSTAINED IN MY EMPLOYMENT WITH COLUMBIA/HCA HEALTHCARE CORPORATION AND/OR AN AFFILIATED EMPLOYER FOR ANY NEGLIGENCE OF COLUMBIA/HCA HEALTHCARE CORPORATION AND/OR AN AFFILIATED EMPLOYER, WHETHER IT BE THE SOLE NEGLIGENCE OF COLUMBIA/HCA HEALTHCARE CORPORATION AND/OR AN AFFILIATED EMPLOYER OR CONCURRENT WITH THE NEGLIGENCE OF ANOTHER PERSON OR ENTITY, OR FOR ANY GROSS NEGLIGENCE OF COLUMBIA/HCA HEALTHCARE CORPORATION AND/OR AN AFFILIATED EMPLOYER. MY ONLY REMEDY WILL BE TO RECEIVE BENEFITS UNDER THE PLAN.

I acknowledge that I am executing this document voluntarily and without duress from any person; that no representation by any person acting on behalf of Columbia/HCA Healthcare Corporation and/or an Affiliated Employer has influenced or induced the execution of this document; that I have carefully read and understand the contents of this document and have signed this document as my own free act, being fully sane, sober and competent to do so; that I am not under the influence of any substance nor under any mental incapacity that would affect me at the time of signing; and that I am aware of the consequences of the execution of this document.

I acknowledge that I have received a copy of the Summary Plan Description and have read and reviewed it before signing this election. To the extent I have had questions regarding the Plan, I have been given the opportunity to ask them and receive answers and to seek legal advice to the extent desired. I represent and acknowledge by execution of this document that I can read, write and understand the language used in this document and have had the document verbally explained to me. I also understand that by making this election, it has no effect on my employment at Columbia/HCA Healthcare Corporation and/or an Affiliated Employer.

By signing below, I am assigning to Columbia/HCA Healthcare Corporation and/or any Affiliated Employer the right to recover from a third party damages for my occupational injury, death or disease which are covered by the Plan.

I represent and acknowledge that I understand that Columbia/HCA Healthcare Corporation has revoked all plans or arrangements other than the Plan for the payment of benefits attributable to a job-related injury. If I am currently receiving occupational benefits, however, such benefits will continue as set forth in the Plan under which those benefits are being provided, and in accordance with the terms and conditions of that Plan. I also understand that should I elect to retain my legal rights to sue Columbia/HCA Healthcare Corporation and/or an Affiliated Employer and reject the benefits outlined in the Plan, I must request the appropriate form from the Human Resources Director.

Diana Reece
**Employee Printed Name**

X _____
**Employee Signature**

12-11-97
**Date Signed**

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
**Social Security Number**

T. Stevens
**Witness Printed Name**

_____
**Witness Signature**

12-11-97
**Date Signed**

CutePDF - www.tooto.com



# COLUMBIA/HCA
## Healthcare Corporation

**EMPLOYEE HEALTH
AND SAFETY PROGRAM
SUMMARY PLAN
DESCRIPTION**

OPTION    A

1997

**EXHIBIT**

Plaintiffs No. B113

B-3

# COLUMBIA/HCA HEALTHCARE CORPORATION

## EMPLOYEE HEALTH AND SAFETY PROGRAM
## SUMMARY PLAN DESCRIPTION

### GENERAL INFORMATION

Columbia/HCA Healthcare Corporation ("Sponsor") has adopted for its Affiliated Employers, as listed on Exhibit "B," an Employee Health and Safety Program, Option A or Option B, ("Plan"), effective November 1, 1997, for the prevention of on-the-job work-related injuries and diseases. Your facility as an Affiliated Employer has elected to provide occupational benefits under Option A of the Columbia/HCA Healthcare Corporation Employee Health and Safety Program Benefit Plan. The Plan complies with state and federal laws, and is maintained for the exclusive benefit of eligible Employees of the Affiliated Employers whose principal places of employment are located in Texas. Generally, under the Plan, certain medical treatment is provided to eligible Employees for work-related, on-the-job injuries or diseases. Under certain conditions, wage replacement benefits will be paid.

Plan Administrators appointed in writing by the Affiliated Employers will administer the Plan. For purposes of Section 3(16) of the Employee Retirement Income Security Act of 1974 ("ERISA"), the Affiliated Employers are the Administrators of the Plan.

This Summary is intended to briefly describe the principal provisions of the Plan. A complete copy of the Plan document is available for copying or review by any eligible Employee desiring more detailed information. If a question should arise concerning the Plan, the Plan document (and not this Summary) shall govern and determine your rights. The interpretation of the Plan by the Plan Administrator shall be conclusive as to all matters.

The Affiliated Employers are non-subscribers to the Texas Workers' Compensation Act and thus, do not provide workers' compensation insurance benefits to Employees.

### WHAT IS AN EMPLOYEE HEALTH AND SAFETY PROGRAM?

The Employee Health and Safety Program is a plan for the prevention of work-related injuries and diseases but also provides eligible Participants with certain medical care and treatment for accidental on-the-job injuries or diseases, and certain wage replacement benefits because of such injuries or diseases.

### WHO IS ELIGIBLE TO PARTICIPATE IN THE PLAN?

Every Employee of an Affiliated Employer whose principal place of employment for the Affiliated Employer is located in Texas is eligible to elect to participate in the Plan. The Plan Year begins on January 1 and ends on the following December 31. However, the first Plan Year shall be the short year from November 1, 1997 through December 31, 1997. The records of the

Option A

Plan will be kept on a calendar year basis.

In order to participate in the Plan, an Employee must make a written Election to Participate in the Plan. By executing the Election form (Exhibit A), the Employee must give up any right that the Employee and his/her heirs, beneficiaries or assigns have to recover from The Sponsor, the Affiliated Employer, their directors, officers, shareholders, employees or agents for injuries, diseases and/or death to the Employee arising out of the course and scope of the Employee's employment with the Affiliated Employer. This means that if a Participant in the Plan is injured or dies in the course and scope of his/her employment, the only relief will be to receive the benefits provided by the Plan. The waiver and release must be in the form attached to this Summary Plan Description as Exhibit "A." The waiver and release will not apply to injuries, diseases or death caused by events that occur entirely after the termination of the Plan.

## DEFINITIONS

"Course and Scope of Employment" shall mean an activity that originates in the work, business, trade or profession of an Employer and that is performed by an Employee while solely engaged in or about the furtherance of the affairs or business of an Employer. The term includes activities conducted on the premises of an Employer or at other locations designated by the Employer. This term does not include:

1.  a Participant's transportation to and from his place of employment, unless the transportation is furnished as part of the employment arrangement or paid for by the employer, or the means of transportation are under the control of the employer, or the Participant is directed, as part of his or her employment, to proceed from one place to another place.

2.  travel by the Participant in furtherance of the affairs or business of an Employer if such travel is also in furtherance of personal or private affairs of the Participant, unless: (a) the travel to the place of occurrence of the Injury would have been made even had there been no personal or private affairs of the Participant to be furthered by the travel; and (b) the travel would not have been made had there been no affairs or business of the Employer to be furthered by the travel.

"Disease" shall mean a disease which is contracted in the course and scope of the Participant's employment. Each occurrence report of occupational disease, i.e. heart attacks, allergies, etc., and subsequent evaluation(s), shall be considered on its medical diagnostic merits as to whether or not an occupational disease as defined exists.

"Injury" shall mean the medical and/or physical condition resulting from an Occurrence. This definition does not include pre-existing medical conditions, once the acute medical/physical episode associated with the Occurrence has been treated; or mental health conditions, other than

2

Postraumatic Stress Disorder as diagnosed by a Provider.

"Maximum Medical Improvement" shall mean the point at which a Treating Physician determines that a Participant who suffered an Injury or Disease will not improve substantially as a result of additional medical treatment or physical therapy, or surgical intervention.

"Modified Duty" shall mean limited duty assigned by the Employer to a Participant according to his physical limitations as identified by the Treating Physician. Modified duty is provided only for occupational Injuries or Diseases and does not guarantee a temporary position or one that is comparable with pre-Injury/Disease job duties or schedules.

"Occurrence" shall mean an event that occurs in the course and scope of employment, and in the furtherance of the business of the Employer, and that may or may not result in an Employee's Injury or Disease.

## WHAT ARE THE PLAN BENEFITS?

Under the Plan, in the event of an accidental on-the-job work related injury or disease, the Affiliated Employer will provide for (i) one hundred percent (100%) of covered reasonable and necessary medical expenses; and (ii) certain wage replacement benefits. The Benefits under this Plan are the Participant's sole and exclusive remedy for occupational injury or disease.

An occupational injury is the medical and/or physical condition resulting from an occurrence, but does not include pre-existing medical conditions or mental health conditions, other than posttraumatic stress disorder. An occupational disease is a disease that is contracted in the course and scope of the Participant's employment; and, each occurrence report of occupational disease, i.e. heart attack, allergy, etc., and subsequent evaluation(s), shall be considered on its medical diagnostic merits as to whether an occupational disease exists.

### Medical Benefits:

The medical benefits that are paid under the Plan will be one hundred percent (100%) of reasonable and necessary charges for hospital confinement, physician's services, prescription drugs and physical rehabilitation, necessary as a result of an accidental on-the-job work related injury or disease, and provided by a Provider approved by your Plan Administrator. The medical benefits will continue until the earlier of (i) a physician approved by the Plan Administrator determines that the Participant has reached the point at which additional medical treatment or physical therapy will not substantially improve the Participant's condition; (ii) the Plan Administrator determines that benefits should be terminated in accordance with any of the Plan provisions, including but not limited to the Participant's failure to comply with the Plan; (iii) the Plan is terminated; and/or (iv) the Participant ceases to be an Employee.

3

Wage Replacement Benefits:

The wage replacement benefits will apply only if the physician approved by the Plan Administrator has ordered the Participant not to return to full or modified duty work.

For non-exempt Participants, from the time the Treating Physician orders the Participant not to return to work forward, the wage replacement benefits are 100% of the Participant's average hourly base wages for the previous 13 weeks, multiplied by the average number of hours that the Participant worked in each of the previous 13 weeks, not to exceed 40 hours per week (and not to include overtime, shift differential, premium or bonus pay) for the first 30 calendar days of lost time. If the Participant has not worked at least 13 weeks prior to the occurrence, the calculation will be performed as set forth above, based on the number of work weeks completed by the Participant, or as may be otherwise determined by the Plan Administrator. At the end of the first 30 day period, the Participant will receive 90% of his/her average hourly base wages as calculated above, until the end of the wage continuation period, as set forth below.

For exempt Participants, from the time the Treating Physician orders the Participant not to return to work forward, the wage replacement benefits are 100% of the Participant's average salary received for the previous 13 weeks for the first 30 calendar days of lost time. If the Participant has not worked at least 13 weeks prior to the occurrence, the calculation will be performed as set forth above, based on the number of work weeks completed by the Participant, or as may be otherwise determined by the Plan Administrator. At the end of the first 30 day period, the Participant will receive 90% of his/her average salary as calculated above, until the end of the wage continuation period as set forth below.

If a Participant (exempt or non-exempt) is released for part-time work, his/her wage replacement benefits will be the difference between his/her compensation for the part time work and what his/her average compensation has been for the previous 13 weeks, based upon the calculation described above.

These wage replacement benefits will continue until the earlier of (i) the time that the Participant is released by the physician approved by the Plan Administrator to return to full or modified duty work; (ii) a Plan Administrator approved physician determines that the Participant has reached the point at which additional medical treatment or physical therapy will not substantially improve his/her condition; (iii) the Plan Administrator determines that benefits should be terminated in accordance with any of the Plan provisions, including but not limited to the Participant's failure to comply with the Plan; (iv) the Plan is terminated; and/or (v) the Participant ceases to be an Employee.

Modified Duty:

When a Participant is given a release to return to work with restrictions (modified duty), subsequent to an occurrence, the Participant's Supervisor in coordination with the Employee Health Nurse/Injury Coordinator will determine what work is available and will attempt to place

the Participant according to his/her limitations as identified by the Treating Physician. Such work may not be on the Participant's usually scheduled days, his/her usually scheduled shift or involve his/her regular job duties. A Participant returned to modified duty will receive 100% of his/her base pay as calculated above. Modified duty applies only to occupational injuries or diseases covered by this Plan.

Modified duty may be provided, at the option of the Plan Administrator, until the earlier of (i) a physician approved by the Plan Administrator determines that the Participant has reached the point at which additional medical treatment or physical therapy will not substantially improve his/her condition; (ii) the Participant is released by the physician approved by the Plan Administrator to return to full duty/work; (iii) the Plan Administrator determines that benefits should be terminated in accordance with the Plan provisions, including but not limited to the Participant's failure to comply with the Plan; (iv) the Plan is terminated; and/or (v) the Participant ceases to be an Employee.

Permanent Total Disability Benefits:

In the case of a Participant's permanent total disability, which means that the Provider has determined that the Participant has reached maximum medical improvement and can no longer perform on a regular basis the essential duties as described in the job description, with or without reasonable accommodations, there are no guaranteed benefits. However, a settlement will be offered to the Participant.

Death Benefits:

In the case of a Participant's death caused by an Occurrence, there are no guaranteed benefits. However, a settlement will be offered to the Participant's beneficiaries.

GENERAL INFORMATION REGARDING BENEFITS

The above benefits are referred to as the "Benefits."

In order to receive Benefits under the Plan, a Participant must keep the Plan Administrator informed of his/her condition after each medical visit and fully cooperate with the Plan Administrator and the physician approved by the Plan Administrator. This cooperation includes, without limitation, giving the Plan Administrator access to all medical records pertaining to the injury or disease and/or any previous condition that predisposed the Participant to the injury or disease, and allowing the Plan Administrator to discuss the injury or disease with the treating physician.

The Plan Administrator will designate health care providers ("Providers"), which must provide necessary medical care and treatment to an injured Participant. To receive Benefits, the

Participant must be treated by a Provider unless in emergency situations.

To be eligible to receive Benefits, the Participant must comply with the requirements described below.

**WHAT MUST A PARTICIPANT DO TO BE ENTITLED TO BENEFITS?**

In the event of an on-the-job work-related occurrence, the Participant must notify his/her Supervisor or, in his/her absence, the Department Manager immediately (or no later than the shift in which the occurrence occurred). If it is after hours or on the weekend, the Participant must notify his/her Supervisor or, in his/her absence, the House Supervisor. In addition, the Participant must complete an Occurrence Report by signing, dating and returning it to his/her Supervisor before leaving the premises. During normal business hours, the Employee Health Nurse (if it is after hours or on the weekend, the House Supervisor) will assist the Participant in obtaining necessary medical treatment from a Provider. The Employee Health Nurse will then assist the Participant in obtaining required report forms which the Participant must complete and file with the Employee Health Nurse/Injury Coordinator. Immediately after primary medical treatment and after each succeeding appointment with the Provider, the Participant must return the Physician's Report to the Employee Health Nurse. The Employee Health Nurse will work in coordination with the Human Resources Director/Injury Coordinator/Designated Person in charge of the Employee Health and Safety Program for on-going status of the Participant's medical care. The Plan Administrator shall be entitled to obtain records, consultation, prognosis and return to work information from the Treating Physician or any Provider; and, by participation in this Plan, the Participant authorizes the foregoing receipt of records and communication.

The provision of payment for an Participant's initial visit(s) to a Provider shall not constitute a determination that the Participant is entitled to further Benefits under this Plan.

**The Participant shall not be entitled to Benefits or continued Benefits under the Plan if any of the following occur:**

1. if the alleged disease, or the alleged injury, is not a Disease or an Injury as defined in this Plan, or if the alleged disease, or the alleged injury, is discovered to have been intentional, self-inflicted, whether sane or insane, feigned, or an attempt to defraud the Affiliated Employer, or if the alleged disease, or the alleged injury, was a complication of a pre-existing condition that was not a Disease or an Injury;

2. if the Participant fails to comply with any of the requirements or provisions of the Plan;

3. if the occurrence is not reported to the Participant's Supervisor or the Department Manager/House Supervisor/Employee Health Nurse/Injury Coordinator/Human Resources Director/Designated Person in charge of the Employee Health and Safety Program Benefit Plan immediately (or no later than the shift on which the occurrence occurred);

6

4. if the Participant fails to complete an Employee Occurrence Report by dating, signing and giving it to his/her Supervisor or the Department Manager/House Supervisor/Employee Health Nurse/Injury Coordinator/Human Resources Director/Designated Person in charge of the Employee Health and Safety Program Benefit Plan within the shift that the occurrence occurred (or before leaving the premises);

5. if the Participant does not follow the directions of the Provider (i.e., physician, physical therapist, etc.);

6. if the Participant uses an unauthorized Provider in a non-emergency situation without prior approval from the Plan Administrator or designee;

7. if the Participant fails to report to work to his or her Department Manager/Employee Health Nurse/Human Resources Director or Designated Person in charge of the Employee Health and Safety Program for work upon being released for full or modified duty by the Treating Physician, as specified in the release;

8. if the Participant is determined to be in violation of the Affiliated Employer's Drug-Free Workplace Policy (or drug and alcohol policy) at the time of the occurrence or anytime thereafter, or if the Participant refuses to submit to drug and alcohol testing, if requested;

9. if the Participant was untruthful in regard to any aspect of the required information supplied as part of the employment process;

10. if the Participant's injury or disease resulted from the Participant's own reckless behavior or horseplay; reckless behavior can include failure to follow mandatory safety rules and/or repeated failure to follow one or more safety practices as specified in the *Employee Guide to Health and Safety*, the video, *Safety Begins With You* or any replacement or supplementary safety policies and/or manuals of the Affiliated Employer;

11. if the Participant is or becomes self-employed or employed by another employer and performs duties that exceed the Provider's restrictions;

12. if the Participant voluntarily participates in any off-duty recreational, social, athletic or other activity which exceeds the physician's restrictions;

13. if the Participant fails to cooperate in regard to communications with, or instructions provided by, the Plan Administrator and/or its designee, i.e., the designated person in charge of the Employee Health and Safety Program Benefit Plan;

7

14.   if the Participant is in violation of the Election to Participate Form ("Exhibit A") by filing a lawsuit for negligence against the Sponsor and/or the Plan Administrator or Affiliated Employer seeking damages that would be provided under this Plan;

15.   if the Occurrence, based on a preponderance of evidence, was caused by the negligence of a third party;

16.   if the Participant's employment terminates;

17.   if the Treating Physician determines that the Participant has reached maximum medical improvement, or such earlier time as set forth herein; or

18.   if the Plan terminates.

During an extended period of absence from work when the Participant is receiving medical care and treatment from a Provider, the Participant must follow the advice and recommendations of the Provider to remain eligible for continuing medical treatment. The failure of the Participant to keep scheduled appointments and to follow the prescribed treatment may result in forfeiture of continued Benefits under this Plan.

If a third party is or may be responsible or partially responsible for the injuries, diseases or death suffered by a Participant, the Affiliated Employer shall have the right to recover monies from the third party, which it pays to or on behalf of the Participant related to such injuries, diseases or death.  By participating in this Plan, the Participant assigns to the Affiliated Employer the right to recover from a third party monies which the Affiliated Employer paid or may reasonably be required to pay for or on behalf of the Participant related to the injuries, diseases or death.  Thus, the Affiliated Employer will have an opportunity to recover its expenses from the third party which caused the Participant's injury, disease or death.  If the Participant fails to assist the Affiliated Employer's attempt to recover monies from the third party, the Participant shall not be entitled to continued Benefits under the Plan.

If an injured Participant receives benefits from another plan as a result of an on-the-job work related injury or disease, the Benefits under this Plan will be reduced so that the total Benefits received by the Participant will not exceed the Benefits that are to be provided under this Plan.

## WHO ADMINISTERS THE PLAN AND WHAT ARE HIS DUTIES?

The Plan Administrator is an individual or group who is/are appointed in writing by the Affiliated Employer.  The Plan Administrator is charged with the general administration of the Plan and is given the responsibility to make the rules of administering the Plan, to construe its provisions, to correct its defects and supply any omissions or reconcile any inconsistencies which may resolve all controversies.  Its actions in these matters, when performed in good faith and in its sole judgment, shall be final as to all parties.  If the Affiliated Employer does not designate in writing a Plan Administrator, the Affiliated Employer shall itself act as Plan Administrator.

8

## HOW DO BENEFITS BEGIN?

If an occurrence occurs, no matter how minor, the Participant must report it immediately (but not later than the shift on which it occurred) to the Supervisor or, in his/her absence, the Department Manager/House Supervisor/Employee Health Nurse/Injury Coordinator/Human Resources Director/Designated Person in charge of the Employee Health and Safety Program. The Participant must also fill out an Employee Occurrence Report before leaving the premises. If the Participant needs medical attention, the Employee Health Nurse will arrange for the Participant to see an authorized Provider.  To ensure that medical benefits will be considered under the Plan, the Participant will also need to:

1.   complete a Release of Medical Records for Health Care Benefits;

2.   receive authorization for payment; and,

3.   obtain a Physician's Report form.

Charges for medical evaluation or treatment must be pre-approved in writing by the Plan Administrator or designee.  If the designated Provider restricts you from returning to work, wage replacement will begin.

When an occurrence is reported, the report will be acted upon by the Plan Administrator. If benefits are denied or ceased for any reason, the Plan Administrator will notify you of his action and reasons why, with specific references to the Plan provisions that apply.  The Plan Administrator will also tell you how you can appeal the decision.

## WHAT SHOULD I DO IF MY BENEFITS ARE DENIED OR CEASED?

If your benefits are denied or ceased, you may file an appeal with the Plan Administrator. In order to make an appeal, you must submit a written request to the Plan Administrator within sixty (60) days after your claim is first denied or ceased. In your request for an appeal, you may submit whatever comments or arguments you wish. If a hearing is held as part of the review process, you may represent yourself or appoint a representative.

The Review Committee must make their decision under normal circumstances within sixty (60) days after the decision.  In special circumstances the decision may be delayed but must, in any event, be made no later than one hundred and twenty (120) days after the appeal is received.  The decision on appeal will be in writing and will include specific reasons for the decision.

If an extension of time for a decision upon a claim is required because of special circumstances, the Plan Administrator will notify you of the extension in writing and will indicate the special circumstances.

9

CMPDF www.texis.com

## ARE PLAN BENEFITS INSURED?

No. Plan Benefits will be paid from the general assets of the Affiliated Employers and are not guaranteed under a policy associated with this Plan. This Plan is a non-funded occupational welfare benefit plan for eligible Texas employees.

## WHAT ARE MY EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974 (ERISA) RIGHTS?

As an Employee covered by this Plan, you have certain rights and protections under ERISA, which provide that all Plan participants shall be entitled to:

1. examine, without charge, at the Plan Administrator's office and at other locations such as worksites, all Plan documents filed by the Plan with the U.S. Department of Labor; and

2. obtain copies of all Plan documents and other Plan information upon written request to the Plan Administrator (the Plan Administrator may make a reasonable charge for the copies).

In addition to creating rights for Plan participants, ERISA imposes duties upon the people who are responsible for the operation of the Plan. The people who operate your Plan, called "fiduciaries" of the Plan, have a duty to do so prudently and in the interest of you and other Plan participants. No one, including the Plan Administrator or any other person, may fire you or otherwise discriminate against you in any way to prevent you from obtaining a Benefit or exercising your rights under ERISA. If your claim for a Benefit is denied in whole or in part you must receive a written explanation of the reason for the denial. You have the right to have the Review Committee review and reconsider your claim. Under ERISA, there are steps you can take to enforce the above rights. For instance, if you request materials from the Plan and do not receive them within thirty (30) days, you may file suit in a federal court. In such a case, the court may require the Plan Administrator to provide the materials and pay you up to $100 a day until you receive the materials, unless the materials were not sent because of reasons beyond the control of the Plan Administrator. If you have a claim for Benefits which is denied or ignored, in whole or in part, you may file suit in a state or federal court. If it should happen that Plan fiduciaries misuse the Plan's money, or if you are discriminated against for asserting your rights, you may seek assistance from the U.S. Department of Labor, or you may file suit in a federal court. The court will decide who should pay court costs and legal fees. If you lose, successful the court may order the person you have sued to pay these costs and fees. If you lose, the court may order you to pay these costs and fees, for example, if it finds your claim is frivolous. If you have any questions about your Plan, you should contact the Plan Administrator. If you have any questions about this statement or about your rights under ERISA, you should contact the nearest Area Office of the U.S. Labor-Management Services Administration, Department of Labor at 525 S. Griffin, Dallas, TX 75202, 214/767-6831.

## CAN THE PLAN BE AMENDED?

The provisions of this Plan may be amended at any time and from time to time by the Sponsor; provided, however, that a summary of any material reduction in covered services or benefits is provided to Participants within sixty (60) days of adoption of those

## HOW LONG WILL THE PLAN CONTINUE?

The Sponsor or an Affiliated Employer may terminate the Plan at any time if the Sponsor or the Affiliated Employer has sent to the Plan Participants at least thirty (30) days prior written notice of its intention to terminate the Plan.

## PARA LOS EMPLEADOS QUE HABLAN ESPANOL

ESTE RESUMEN DE LA DESCRIPCION DEL PLAN CONTIENE UN RESUMEN EN INGLES DE LOS DERECHOS Y BENEFICIOS DE SU PLAN DE BENEFICIOS EN CASO DE LESIONES DE EMPLEADOS DEL PATROCINADOR. SI TIENE ALGUNA DIFICULTAD PARA ENTENDER ALGUNA PARTE DE ESTE RESUMEN DE DESCRIPCION DEL PLAN, USTED DEBE COMUNICARSE CON SU SUPERVISOR DURANTE LAS HORAS NORMALES DE TRABAJO. TAMBIEN PUEDE COMUNICARSE CON EL ADMINISTRADOR DEL PLAN EN COLUMBIA/HCA HEALTHCARE CORPORATION O LLAMANDO AL NUMERO DE TELEFONO QUE APARECE EN EL DIRECTORIO DEL PLAN QUE SE INCLUYE EN EL RESUMEN DE LA DESCRIPCION DEL PLAN. SE ATIENDE DE LUNES A VIERNES DESDE LAS 8:00 A.M. HASTA LAS 5:00 P.M.

## PLAN DIRECTORY

Listed below is other pertinent information concerning the Plan:

| | |
|---|---|
| Sponsor: | Columbia/HCA Healthcare Corporation<br>One Park Plaza<br>Nashville, TN 37202-0555<br>Telephone: (615) 344-5875 |
| Agent for Service of Legal Process: | Service of legal process may be made upon the Plan Administrator at the corresponding address, as listed in Exhibit "B." |
| Sponsor Identification Number: | 75-2497104 |
| Plan Fiscal Year: | January 1 to December 31 (First Plan Year: November 1, 1997 through December 31, 1997) |
| Plan Number: | 513 |

12

# *The Corpus Christi* MEDICAL CENTER

*Bay Area • Bayview • Doctors Regional • The Heart Hospital*

P.O. Box 8991 • Corpus Christi, Texas 78468-8991

February 1, 1999

**VIA CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

Diana Reece
13570 Peseta Court
Corpus Christi, Texas 78418

**Re: Employee Health and Safety Program Benefit Plan**

Dear Ms. Reece:

As you know, The Corpus Christi Medical Center Bayview is a non-subscriber to the Texas Workers' Compensation Program. Instead, we have implemented an Employee Health and Safety Program Benefit Plan which is primarily preventive in nature, but does include a component for providing medical and/or wage replacement benefits for employees who are legitimately injured on the job. On December 11, 1997 you elected to participate in the Employee Health and Safety Program Benefit Plan and received a copy of the Summary Plan Description

On January 16, 1999 you were involved in an occurrence where you sustained a muscle strain, left SI joint irritation. Bayview responded and provided medical evaluation and treatment in accordance with the employee Health and Safety Program Benefit Plan.

Subsequently, effective January 23, 1999, you voluntarily resigned your position at Bayview. As you were trained, under the Employee Health and Safety Benefit Program Plan, Section 3.3, a Participant will cease to be a Participant in the Plan on the date on which the Participant is no longer and Employee. Therefore, The Corpus Christi Medical Center Bayview, in accordance with the Employee Health and Safety Program Benefit Plan, is ceasing benefits for your January 16, 1999 occurrence based on the following:

> Section 5.3 (q) If the Participant's employment terminates.

Under the Employee Health and Safety Benefit Program Plan, you have a right to appeal this decision, and that you must do so within sixty (60) days after the receipt of this letter. You must:

1       File a written request with the Hospital's Review Committee for a review of your denied request for benefits and any pertinent documents; and

2.      Submit written issues and comments to the Review Committee.

The Review Committee will then notify you of its decision in writing. The decision will be made within sixty (60) days after the request for review is received from you.

If you have any questions, please feel free to contact me.

Sincerely,

*Todd Stevens*
Todd Stevens

**EXHIBIT**
**B-4**

Director of Human Resources / Employee Health & Safety Program Coordinator

---

**CCMC-Bay Area**
7101 S. Padre Island Dr.
Corpus Christi, TX 78412
(512) 985-1200

**CCMC-Bayview**
6226 Saratoga Blvd.
Corpus Christi, TX 78414
(512) 993-9700

**CCMC-Doctors Regional**
3315 S. Alameda
Corpus Christi, TX 78411
(512) 857-1400

**CCMC-The Heart Hospital**
7002 Williams Dr.
Corpus Christi, TX 78412
(512) 980-1800

Case 2:00-cv-00112   Document 19   Filed in TXSD on 11/02/2000   Page 52 of 67

United States District Court
Southern District of Texas
FILED

SEP 0 7 2000

Michael N. Milby
Clerk of Court

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| DIANA L. REECE, | § | CIVIL ACTION |
| | § | |
| PLAINTIFF, | § | CA-C-00-112 |
| | § | |
| VS. | § | CORPUS CHRISTI, TEXAS |
| | § | MAY 17, 2000 |
| COLUMBIA/HCA HEALTHCARE | § | 3:09 P.M. |
| CORPORATION, ET AL, | § | |
| | § | |
| DEFENDANTS. | § | |

. . . . . . . . . . . . . . . . . . . . . . . . . . . §

TRANSCRIPT OF SCHEDULING CONFERENCE

BEFORE THE HONORABLE HAYDEN W. HEAD, JR.
UNITED STATES DISTRICT JUDGE

APPEARANCES FOR:

THE PLAINTIFF:               MS. DIANA L. REECE
                             PRO SE
                             1007 W. YOAKUM
                             KINGSVILLE, TEXAS 78363

THE DEFENDANT:               MR. KERRY L. McGILL
                             MARTIN & ASSOCIATES
                             707 W. 10TH STREET
                             AUSTIN, TEXAS 78701

THE COURT RECORDER:          MS. GENAY ROGAN

PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING
TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE:
GARCIA SERVICES CORP., 710 BUFFALO ST., STE 210A
CORPUS CHRISTI, TEXAS 78401, (361) 882-5753

EXHIBIT

C

1       (The proceedings began at 3:09 p.m.)

2           THE COURT:  Ms. Reece, did you get a lawyer yet?

3           MS. REECE:  No, sir, I have not.

4           THE COURT:  Well, what are you going to do?

5           MS. REECE:  I'm going to continue looking,

6    attempting to find one.

7           THE COURT:  Well, you didn't write your pleadings.

8           MS. REECE:  No, sir.  Well, some of them, no, but

9    I'm not able to --

10          THE COURT:  Well, you didn't write your complaint.

11          MS. REECE:  No, I had assistance, but I'm not able

12   to find anybody that will represent me in an ERISA case even

13   after checking with about seven attorneys that specialize in

14   them.  I'm going to continue to follow this through as much

15   as possible.  I think we've discussed, both of us, a willing-

16   ness for a settlement.

17          THE COURT:  What's your problem?  You got, you were

18   handling some violent patients and so you got hurt?

19          MS. REECE:  Yes, on three different occasions I have

20   documented injuries.  I voluntarily resigned my position at

21   the time.  My mind is I don't feel that I was accurately

22   diagnosed, adequately treated and I have a long-term chronic

23   condition.

24          THE COURT:  Which is?

25          MS. REECE:  It has been diagnosed as an SI dysfunc-

1  tion and a protruding or compressed disk, sacroiliac

2  dysfunction.

3          THE COURT:  Who made that diagnosis?

4          MS. REECE:  Two different doctors.  The partici-

5  pating doctor that is with the employee health program for

6  Columbia, Dr. Portugal, did the initial SI dysfunction, and

7  subsequent Dr. Mauger at the Pain Management Clinic stated

8  that I had symptoms.

9          THE COURT:  Is Dr. Mauger a doctor?

10          MS. REECE:  I believe so.

11          THE COURT:  Okay.

12          MS. REECE:  Doctor or chiropractor.

13          THE COURT:  Chiropractor.

14          MS. REECE:  Yes.

15          THE COURT:  He's not an M.D.

16          MS. REECE:  No, sir.

17          THE COURT:  Right.

18          MS. REECE:  I don't believe so.

19          THE COURT:  I don't know.  I wouldn't know, I just

20  see the television advertisements.

21          MS. REECE:  The bottom line, Your Honor, is I tried

22  to follow up with every course that I had as far as continued

23  treatment with this, appealed, was denied, requested -- was

24  denied because of negative x-ray results -- requested an MRI

25  for more accurate diagnosis, was denied that and now continue

4

1    to need regular physical therapy.

2             THE COURT:  So have you got anybody that will say

3    that you have a medical condition?

4             MS. REECE:  Yes, sir.

5             THE COURT:  Have you got anybody that will say you

6    have a medical condition that was caused by an event that

7    occurred to you at work?

8             MS. REECE:  Yes, sir.

9             THE COURT:  Have you got somebody who will testify

10   that your medical condition and reasonable medical probab-

11   ility occurred simply while you were there?

12            MS. REECE:  Simply while I was there?

13            THE COURT:  Uh-huh.  Just as a condition of your

14   employment, without regard to whether or not it was

15   negligently caused.

16            MS. REECE:  Yes, sir.  On three different occasions

17   there's documentation.

18            THE COURT:  Why aren't you giving her benefits?

19            MR. McGILL:  Your Honor, Kerry McGill here on behalf

20   on the defendant.  This is an ERISA plan.  Pursuant to the

21   terms of the ERISA plan, once the employee voluntarily

22   terminates, their eligibility under the plan terminates.

23            THE COURT:  What do you mean she voluntarily

24   terminates?  I mean what is it, what --

25            MR. McGILL:  She quit her job and went and got

1    another job at another hospital.

2              THE COURT:  Okay.

3              MR. McGILL:  Pursuant to the terms of the plan,

4    she's no longer eligible.

5              THE COURT:  Why did you quit?

6              MS. REECE:  At the time I had an offer for, I had

7    finished going to school and had an offer for a counseling

8    job that didn't work out.  I called about four days after my

9    termination date or my resignation date and was told that

10   there wouldn't be a problem with me rescinding my resigna-

11   tion, and then the next time I talked to the Human Resources

12   director he said, "No, the resignation will be as stands."

13   So I believe there was discrimination on reemployment also --

14             THE COURT:  Did you --

15             MS. REECE:  -- because of my condition.

16             THE COURT:  Well, that's an interesting case.

17             MS. REECE:  Uh-huh.

18             THE COURT:  What kind of discrimination, simply

19   because you were already injured?

20             MS. REECE:  Yes, sir.  I do believe so.

21             THE COURT:  Well, do they have --

22             MS. REECE:  My personnel records --

23             THE COURT:  Excuse me.  Do they have to take you

24   back?

25             MS. REECE:  As far as their reemployment policy

1    stated in the employee handbook, it states that it would be

2    decided upon my personnel records, my superiors' recommen-

3    dations and I believe reason for termination.  And I believe

4    under all those circumstances, I had favorable personnel

5    records, I believe that my superiors or my supervisors would

6    have recommended rehire and that I wasn't rehired by the fact

7    or for the fact that I had been injured and Columbia's, what

8    shall I say, liability was in effect nonexistent after I

9    terminated my employment.

10           THE COURT:  It would have cost them money to hire

11   you?

12           MS. REECE:  Yes, sir.  They would have continued

13   incurring liability as far as my treatment was concerned.

14           THE COURT:  What do you have to say about that?

15           MR. McGILL:  Well, Your Honor, initially, there is

16   no liability under common law for the injuries that occurred

17   on the job.  More specifically, this was an ERISA plan.

18   Pursuant to the --

19           THE COURT:  Right, but she's saying "You didn't hire

20   me back because then I would qualify," so, you know, thereby

21   saying that that's somehow unlawful.

22           MR. McGILL:  This is Texas, employee-at-will state,

23   Your Honor.  There was no employment contract.

24           MS. REECE:  Also, Your Honor, I do believe that

25   there was negligence involved as far as providing adequate

CMsPDF - www.fesiso.com

1  safety on the unit as far as the --

2          THE COURT:  So what do you want to do about --

3          MS. REECE:  -- acuity of the patient level.

4          THE COURT:  How are you going to be able to repre-

5  sent yourself in this?

6          MS. REECE:  Well, I'm going to do my best.  If this,

7  if it's necessary for this to go to court, to get depositions

8  from co-workers, doctors that I've seen.

9          THE COURT:  Do you have that kind of money?

10          MS. REECE:  Well, as far as I can financially.  As

11  I've stated in letters with Columbia's attorney, Mr. McGill,

12  that this is an issue of principle for me.  If I had realized

13  that -- I signed the agreement for the ERISA employee health

14  and safety program in good faith, believing that Columbia

15  would follow through with any compensation or necessary

16  medical care for me.  I do not believe that they completely

17  followed through with that and just stopped treating me or

18  offering me medical treatment as soon as their legal

19  liability ended.

20          MR. McGILL:  Your Honor, if I may interject, just --

21          MS. REECE:  Sure.

22          MR. McGILL:  The reason why it stopped is because

23  she took another job at another place.  We didn't cut her

24  off, we didn't do anything other than she elected to go

25  somewhere else.  That's why the benefits stopped.  I mean

1  she's trying to make us out as bad guys and we complied

2  wholly with the terms of the plan and that would be our

3  position.

4       MS. REECE:  And I understand that.  I'm sure ignor-

5  ance of the law is not an excuse.  I come from California,

6  I'm sure the laws are different in that state, but I was

7  under the impression that any injuries incurred due to

8  employment were covered lifetime for those injuries.

9       THE COURT:  But you signed an agreement.

10       MS. REECE:  Yes, sir.  And I signed that in good

11  faith.

12       THE COURT:  Well, I know, but I don't know that

13  there's been any bad faith on Columbia's part to --

14       MS. REECE:  And Your Honor, there wasn't really --

15       THE COURT:  I mean, I don't know, where's Columbia's

16  bad faith, if that matters?

17       MS. REECE:  I don't think legally there is a respon-

18  sibility on their part, I think morally there is.

19       THE COURT:  Well, I have legal codes I apply, not

20  moral codes.

21       MS. REECE:  I understand that.  And so the only

22  recourse that I had, because of the legalities of the issue,

23  was to sue for negligence, which I believe I can prove, and

24  also inaccurate diagnosis and inadequate treatment.

25       THE COURT:  Well, I'm going to give you 30 days to

 1   hire a lawyer.  I'm going to enter you as -- you're already

 2   representing yourself.

 3          MS. REECE:  Yes, sir.

 4          THE COURT:  We're not going to do anything in the

 5   case for 30 days.  I'm not going to, we're not going to begin

 6   any discovery, we're just going to sort of let it hang out

 7   where it is.  If you can't hire yourself a lawyer in 30 days

 8   then we're just going to go forward just as if it's any other

 9   lawsuit, I mean you're going to have to do your disclosures,

10   file case managements, prepare depositions, respond to

11   motions for summary judgment, and I can't give you any advice

12   nor any assistance nor can any member of my staff on what

13   positions you should take or how you should present your own.

14   So you --

15          MS. REECE:  I understand.  I believe that I've

16   exhausted most of my options for representation.  I don't

17   think there's anybody willing to take this case.  I've been

18   told --

19          THE COURT:  What does that tell you?

20          MS. REECE:  I believe it tells me that it's not

21   worth it for the attorneys to take this case, that's what I

22   believe.

23          THE COURT:  Well, you're very perceptive.  And what

24   makes it worth it for attorneys?

25          MS. REECE:  I believe the financial compensation.

1    THE COURT:  Exactly.  If it's not worth it for them,

2  I mean if they don't think it's worth it for them, maybe

3  that's a clue that it's not worth it for you.

4    MS. REECE:  I understand that, but may I restate

5  that I'm going with this on principle.

6    THE COURT:  Listen, you can do what you want, you

7  can spend your money however you want, but unless you have,

8  you know, a Lexus sitting outside, you know, you're probably

9  like the rest of us and at the end of the month you can't

10  wait for the first of the month because you need that check.

11  So at some point he's going to begin with the responsibi-

12  lities that he has to his client and that includes deposi-

13  tions, da-da-da, da-da-da, and he's going to file a motion

14  for summary judgment and you've got to respond to it and I'm

15  going to rule, I mean, you know, you've just got to -- and

16  then he's going to ask for costs.  Do you want to tell her

17  about costs?

18    MR. McGILL:  Under ERISA the party that loses, in

19  the Court's discretion can award not only costs, which are

20  usually mandatory, but also attorney's fees, so you could end

21  up having to pay for my attorney's fees.

22    THE COURT:  And those costs include the costs of

23  taking depositions.

24    MR. McGILL:  That's the amount of money that the

25  court reporter charges per page, usually --

1        THE COURT:  You need to investigate that.

2        MS. REECE:  I understand that.  I had hoped that

3   there was some recourse for me in getting compensation.

4        THE COURT:  I don't want you to get hurt worse than

5   you think that you are.  And I can't tell you what to do and

6   I can't warn you off your case.  I can tell you that I

7   wouldn't represent myself.

8        MS. REECE:  I understand that.  I'm not very comfor-

9   table with it myself.

10        THE COURT:  I'm sure it must be difficult for you.

11   I'll talk to you again in 30 days on the telephone, set a

12   1:15 conference call 30 days from today.  Where do you work?

13        MS. REECE:  Right now I work for Palmer Drug Abuse

14   Program as a counselor.

15        THE COURT:  Okay.  So you can speak on the phone at

16   noon?

17        MS. REECE:  Yes.

18        THE COURT:  How did you happen to get that job?

19        MS. REECE:  I went to school for substance abuse

20   counselor and was interviewed and hired.

21        THE COURT:  You did, you went to substance abuse to

22   get the job, that kind of a job?

23        MS. REECE:  Yes, I went to school.

24        THE COURT:  What kind of school is that?  Is that --

25        MS. REECE:  They have two-year degrees but I went

 1  ahead through a vocational-type course through Del Mar

 2  College, and you have to get so many hours of classroom

 3  training and so many hours of on-the-job experience.  And

 4  that was the reason that I had tried to terminate my

 5  employment.

 6          THE COURT:  Well, how did I do with that young lady

 7  that I was sentencing today?  Were you here?

 8          MS. REECE:  Yes, sir, I was.

 9          THE COURT:  Do I get a C even?

10          MS. REECE:  Well, you got tears out of me.

11          THE COURT:  Did I get any C with her?

12          MS. REECE:  I hope so, sir.

13          THE COURT:  Yeah.

14          MS. REECE:  I hope so.

15          THE COURT:  Okay.  You're excused, thank you.

16          MS. REECE:  Thank you.

17          THE COURT:  We'll talk in 30 days.

18          MR. McGILL:  Is that June 17th, ma'am?

19          THE CLERK:  Yes, I'm sorry, I got the wrong date, I

20  think.  That would be, we'll have to set that Tuesday, June

21  the 20th.

22          THE COURT:  That's okay.  And you can tell me at

23  that time -- if you've got a lawyer before that, have him

24  file his appearance, or her appearance as the case may be,

25  and you don't have to show up except for trial and I'll have

1   a conference with the lawyers.

2           THE CLERK:  I'll send you both written notice.

3           MR. McGILL:  Thank you.

4           MS. REECE:  Thank you.

5           MR. McGILL:  May we be excused, Your Honor?

6           THE COURT:  You're excused.

7       (The proceedings ended at 3:21 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I certify that the foregoing is a correct transcription from the electronic sound recording of the proceeds in the above entitled matter.

SEP 0 7 2000

_____        _____
                                                Judith M. Garcia

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| DIANA L. REECE,<br>Plaintiff, | §<br>§<br>§<br>§<br>§<br>§ | |
| V. | § | CIVIL ACTION NO. C-00-112 |
| | § | |
| COLUMBIA/HCA HEALTHCARE<br>CORPORATION, COLUMBIA BAYVIEW<br>PSYCHIATRIC CENTER, AND BAY AREA<br>HEALTHCARE GROUP, LTD. d/b/a<br>CORPUS CHRISTI MEDICAL CENTER,<br>Defendants. | §<br>§<br>§<br>§<br>§<br>§ | |

## ORDER GRANTING SUMMARY JUDGMENT IN FAVOR OF DEFENDANTS

On this day came on for hearing the Motion for Summary Judgment filed by Defendants, Columbia/HCA Healthcare Corporation, Columbia Bayview Psychiatric Center, and Bay Area Healthcare Group, Ltd. d/b/a Corpus Christi Medical Center. The Court, having considered the Motion and attached affidavits and exhibits, Plaintiff's response, the pleadings, transcripts, arguments of counsel, and all other matters before it, finds that the Motion has merit and should be GRANTED.

It is therefore ORDERED, ADJUDGED and DECREED that Plaintiff Diana Reece's entire claim against Defendants, **Columbia/HCA Healthcare Corporation, Columbia Bayview Psychiatric Center, and Bay Area Healthcare Group, Ltd. d/b/a Corpus Christi Medical Center** is DISMISSED with prejudice.

The Court denies all relief not granted in this judgment.

Each party shall bear its own costs.

SIGNED this _____ day of _____, 2000.

_____

JUDGE PRESIDING